**UNITED STATES of America, Appellee,**

v.

**Martha Molina Sanchez CARVALHO, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Fernando Leal CARVALHO, Appellant.**

**Nos. 83–5204, 83–5205.**

United States Court of Appeals, Fourth Circuit.

Argued May 10, 1984.

Decided Aug. 23, 1984.

---

K.K. Hall, Circuit Judge, dissented and filed opinion.

Robert M. Price, Washington, D.C., for appellants.

Barbara L. Miller, Asst. U.S. Atty., Alexandria, Va. (Elsie L. Munsell, U.S. Atty., William Otis, Asst. U.S. Atty., Alexandria, Va., on brief), for appellee.

Before WIDENER, HALL and MURNAGHAN, Circuit Judges.

MURNAGHAN, Circuit Judge:

Martha and Fernando Carvalho appeal from their convictions under 18 U.S.C. § 1426(b)[1] for knowing use of false alien registration receipt cards.

---

1. § 1426. Reproduction of naturalization or citizenship papers

(b) Whoever utters, sells, disposes of or uses as true or genuine any false, forged, altered, antedated or counterfeited oath, notice, affidavit, certificate of arrival, declaration of intention to become a citizen, certificate or documentary evidence of naturalization or citizenship, or any order, or proceeding required or authorized by any law relating to naturalization or citizenship or registry of aliens, or any copy thereof, knowing the same to be false, forged, altered, antedated or counterfeited; . . .

Shall be fined not more than $5,000 or imprisoned not more than five years, or both.

## I.

At 6:30 or 7:00 A.M. on January 25, 1983, Larry Valladolid, a criminal investigator with the Immigration and Naturalization Service, appeared at the Carvalhos' house in search of one Fernando Rodriguez. During the course of his questioning, Valladolid demanded identification from the Carvalhos. Mrs. Carvalho produced passports with lawful entry stamps based on the Carvalhos' "green cards" (alien registration receipt cards). Valladolid copied the alien registration numbers, and departed.

Valladolid returned on March 1, 1983, and asked to see Mrs. Carvalho's green card. Instead, she again showed him her passport. Spying a green card in the same zippered bag from which Mrs. Carvalho had drawn the passport, Valladolid demanded to see the green card. He subsequently declared the green card to be counterfeit. Mr. Carvalho then entered the room, and a similar scene transpired. Mr. Carvalho, after some hesitation, produced his green card, later declared to be counterfeit.

The Carvalhos were indicted on May 2, 1983, and were tried before a jury on July 14–15, 1983. Testimony at trial revealed that Mr. Carvalho entered the United States in January, 1971, deserting his ship in February, 1972 and thereafter remaining in the U.S. He married Ramona Cruz in 1973, and applied for permanent residence shortly thereafter. The marriage failed, and Cruz went back to Puerto Rico, withdrawing the petition for Mr. Carvalho's residency in September, 1974. The INS then found Mr. Carvalho deportable. He disappeared, and was ordered deported.

Martha Sanchez Carvalho entered the U.S. in September, 1972. She remained beyond the duration of her temporary work visa. In June, 1973, she married Luiz Hernandez, and applied for permanent residence. The marriage lasted four months, and after its dissolution, Mrs. Carvalho subsequently was found deportable, and granted voluntary departure in lieu of deportation. She, too, disappeared and was ordered deported.

The Carvalhos met each other in New York City and, by then divorced from their respective spouses, were married in 1975. Late in that year they had a child, who was a United States citizen by virtue of her birth in the United States. The child's birth also provided a *bona fide* basis for the Carvalho's own lawful permanent residency. A friend of the Carvalho's took them to a lawyer named Garcia, who was to arrange for them to obtain the necessary green cards.[2] The Carvalhos, as they testified, had sought the attorney's assistance in part because of their unfamiliarity with the law and language. They paid $1500 for the services in providing the cards, which, according to their uncontradicted testimony, they believed to be genuine. When Garcia told them that all was in order, they had no apparent reason to suspect that their green cards had been forged. Their belief the cards were genuine had been reinforced by the fact that they had left the United States on numerous occasions, and had been successfully readmitted upon presentation of the cards.

At trial, the government sought to portray the Carvalhos as quite sophisticated regarding the immigration laws, and well aware of what they would need to do to obtain permanent residence. The government, therefore, tried to link the earlier attempts to gain residency through marriage with the obtaining of the green cards. The government contended that the forged green cards comprised merely one of a number of ruses to gain residence, and, over objection, introduced affidavits from the former spouses. Two affidavits were from Cruz, one from Hernandez. All were obtained in 1974 after the initial attempts to gain residency through marriage, when Cruz and Hernandez, following the failure of each marriage, had decided to withdraw

---

**2.** At trial, seven years later, the Carvalhos were unable to remember Garcia's full name or the precise location of his offices.

the petitions previously filed on behalf of appellants' efforts to obtain permanent residency. All the affidavits were obtained before the Carvalhos' marriage and the birth (and indeed the conception) of the child possessed of United States citizenship.

The Hernandez affidavit in no way suggests that his marriage to Martha Sanchez (later Carvalho) was not genuine, but rather had been entered into to evade the immigration laws. To the contrary, it states: "I married my wife for love...." It concludes, however:

> I wish, on this date, to withdraw the application for permanent residence petition I have filed for my wife because I plan to terminate my marriage to this woman as soon as possible.

The first Cruz affidavit states that she married Mr. Carvalho to spite Joseph Ortiz, the man with whom she had then been living. She adds (in the typewritten portion) that she "married FERNANDO because I felt sorry for him and out of anger because of what had happened to me," after which appears the handwritten addendum "and I wanted to help him get his residence." Other sections of the affidavit state that the marriage was not consummated (a point disputed by an April, 1975 affidavit of Mr. Carvalho), and the marriage "was to do him a favor." The second Cruz affidavit discusses counseling Cruz received prior to the INS hearing regarding the application process, and includes reference to apparent threats to Cruz if she did not cooperate. At the time Cruz rendered the affidavits, she was pregnant with the child of Joseph Ortiz, the man she sought to spite by marrying Mr. Carvalho.

Although neither Cruz nor Hernandez appeared at trial, the affidavits were admitted over objection. The Carvalhos were each convicted and sentenced to a three-year suspended prison sentence, probation, and a $2,500 fine. On appeal, they contend that the admission of the affidavits was improper under the hearsay rules, the Confrontation Clause of the Sixth Amendment and Rule 404(b) of the Federal Rules of Evidence.[3]

## II.

With respect to the hearsay issue, the government contends that the affidavits were admissible both under FRE 804(b)(3)[4] as a statement against interest, and under FRE 804(b)(4)[5] as a statement of personal or family history.

## A.

■ Under Rule 804(b)(3) there are three prerequisites to admission of a hearsay statement: (1) the declarant must be unavailable; (2) from the perspective of the average, reasonable person, the statement must be truly adverse to the declarant's penal interest; and (3) corroborating circumstances must clearly establish the trustworthiness of the statement. *United*

---

3. They also contend that persistent prosecutorial misconduct requires a reversal, an issue we do not reach.

4. FRE 804(b)(3) covers the following statements by unavailable declarants:

 (3) Statement against interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

5. FRE 804(b)(4) concerns the following statements by unavailable declarants:

 (4) Statement of personal or family history. (A) A statement concerning the declarant's own birth, adoption, marriage, divorce, legitimacy, relationship by blood, adoption, or marriage, ancestry, or other similar fact of personal or family history, even though declarant had no means of acquiring personal knowledge of the matter stated; or (B) a statement concerning the foregoing matters, and death also, of another person, if the declarant was related to the other by blood, adoption, or marriage or was so intimately associated with the other's family as to be likely to have accurate information concerning the matter declared.

*States v. MacDonald,* 688 F.2d 224, 232–233 (4th Cir.1982), *cert. denied,* 459 U.S. 1103, 103 S.Ct. 726, 74 L.Ed.2d 951 (1983).

On the issue of unavailability, appellants contend that there is a scant showing on the record of any reasonable efforts made by the government to locate Cruz and Hernandez. *Cf. United States v. Mathis,* 550 F.2d 180, 182 (4th Cir.1976), *cert. denied,* 429 U.S. 1107, 97 S.Ct. 1140, 51 L.Ed.2d 560 (1977). The government responds that the record clearly shows that Cruz was unavailable. Furthermore, the government argues that appellants' counsel never challenged the unavailability of Hernandez, and therefore have waived the issue. *See e.g., United States v. Parodi,* 703 F.2d 768 (4th Cir.1983).

■ We need not resolve the dispute, however, since the affidavits cannot satisfy the remaining two prerequisites articulated in *United States v. MacDonald, supra.* Although the rule specifically requires that the statement be "contrary to the declarant's pecuniary or proprietary interest" or clearly "subject him to civil or criminal liability," the Hernandez affidavit is completely devoid of any such implications. The affidavit states only that Hernandez married Martha Sanchez for love, but at the time he gave the affidavit, he sought to terminate the marriage. It is inconceivable that the government truly contends that the Hernandez affidavit amounts to a statement against his penal interest. There is not a single statement even suggesting wrongdoing, and it strains credulity to contend that a reasonable person would have viewed a statement that he married his wife for love as being against his penal interest.[6]

A closer question arises with the Cruz affidavits, since there is a reference to getting married in order to obtain residence for Mr. Carvalho. It is by no means clear that an average, reasonable person would perceive such a statement to be against her *own* interest. Even if Cruz should have—and if an average person would have—perceived the statement to be against Mr. Carvalho's interest, it does not follow that the statement would also be viewed as being against the interest of the declarant, Cruz, herself.

■ More to the point, the Cruz affidavit is more clearly, and perhaps more properly, barred by its failure to satisfy the third *MacDonald* prerequisite, requiring that "corroborating circumstances clearly indicate the trustworthiness of the statements." F.R.E. 804(b)(3); *United States v. Brainard,* 690 F.2d 1117, 1124 (4th Cir. 1982). The government has not referred us to any "corroborating circumstances" indicating the trustworthiness of the affidavits, leading inexorably to the conclusion that it presented no such evidence. Furthermore, the trustworthiness of the Cruz affidavit is highly suspect. At the time she rendered the affidavit, she was pregnant with the child of Joseph Ortiz, the person she sought to spite by marrying Mr. Carvalho. Whatever her precise motives might have been at the time, it seems clear that there was a tremendous amount of self-interest in seeing that her marriage with Mr. Carvalho was annulled, and, not incidentally, that Ortiz was not disabused of a belief that the marriage with Carvalho had not been consummated. She articulated specifically the concern about the annulment in the affidavit. Even in light of the *caveat* that it "is the statement rather than the declarant which must be trustworthy," *United States v. Brainard, supra,* at 1124, we conclude that the Cruz affidavits lack reliability and, therefore, fail to satisfy the trustworthiness requirement of F.R.E. 804(b)(3).[7]

---

6. Equally without merit is the government's contention that the fact that the declarants received *Miranda* warnings and made statements under oath is somehow relevant to the present inquiry. The government can hardly be taken as suggesting that all statements under oath or following *Miranda* warnings are, *ipso facto,* statements against one's penal interest within the meaning of the rule.

7. A further indication of the *un*trustworthiness of the affidavit is Mr. Carvalho's own affidavit, taken by the INS after Cruz rendered her affidavits. Mr. Carvalho's affidavit disputes Cruz' contention that her marriage with Mr. Carvalho

## B.

■ The government's alternative contention on the hearsay issue is that, since the affidavits related to the respective marriages of Cruz and Hernandez, they were admissible as "statement[s] concerning the declarant's own ... marriage ..., or other similar fact of personal or family history," under F.R.E. 804(b)(4). While undoubtedly it is correct that for some purposes a statement regarding one's reasons for entering a marriage might well be a "statement concerning" one's marriage, it is also clear that evidence as to motive or purpose, highly debatable or controversial matters, is simply not within the scope of Rule 804(b)(4).

As Judge Weinstein explains, "the rule rests on the assumption that the type of declarant specified by the rule will not make a statement about the type of fact covered by the rule unless it is trustworthy." 4 Weinstein's Evidence § 804(b)(4)[01] (1981). While the assumption is well-justified where the facts at issue concern, for example, the date of a marriage or existence of a ceremony, the trustworthiness attendant upon the circumstances of utterance is substantially diminished once we confront issues such as motive.[8]

The propriety of a distinction between different types of facts concerning personal or family history relating to marriage is buttressed further by a comparison of marriage to the other items on the non-exhaustive list in Rule 804(b)(4). The list includes, for example, birth, adoption, divorce, legitimacy and ancestry. It is difficult to envision how issues similar to the frame of mind at the time of entering a marital relationship could arise regarding the other items on the list. More likely, the relevant issues instead would be a date of birth, existence of an adoption, or details of one's ancestry. Since "marriage" appears in Rule 804(b)(4) in the midst of a list of items unlikely to concern complex issues of motive, we conclude that Cruz' or Hernandez' motives for marrying was not a "fact" within the meaning of FRE 804(b)(4), and, accordingly, that the Rule does not provide a basis for admission of the affidavits.[9]

## III.

■ As the foregoing arguments indicate, we conclude that the district court erred in admitting the affidavits over appellant's hearsay objections. Nor can we conclude that the error was harmless. *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). The crucial issue at trial was the appellants' *knowledge* of the falsity of the green cards. The crucial argument on knowledge was the Carvalhos' purported familiarity with the

---

was never consummated. Even allowing for the self-interest attendant to Mr. Carvalho's own statement, the conflict, at the very least, raises a question of trustworthiness regarding both sides of the story.

**8.** It is useful to recall that Rule 804(b)(4) had its origins in the common law pedigree exception to the hearsay rule. 11 Moore's Federal Practice, § 804.07(4) (2d ed. 1982). Wigmore's discussion of the pedigree exception highlights a distinction between different types of facts similar to the one we are making in the Rule 804(b)(4) context. According to Wigmore, the general inquiry "as to the kind of fact that may be the subject" of the pedigree exception should have been:

Were the ordinary circumstances named in the statement such a marked item in the ordinary family history and so interesting to the family in common that statements about them in the family would be likely to be based on

fairly accurate knowledge and to be sincerely uttered?

5 Wigmore, Evidence § 1502 (Chadbourn rev. 1974). "This certainly includes the fact and date of birth, marriage, and death ...." *Id.,* § 1500. However, declarations "would be excluded where there is any specified and adequate reason to suppose the existence of a motive inconsistent with a fair degree of sincerity." *Id.,* § 1483.

**9.** For the above reasons, we find inapposite the government's citations to *United States v. Rubenstein,* 151 F.2d 915, 918 (2d Cir.1945), *cert. denied,* 326 U.S. 766, 66 S.Ct. 168, 90 L.Ed. 462 (1945), and *United States v. Lutwak,* 195 F.2d 748, 754 (7th Cir.1952), *aff'd,* 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953). While the cases focus on the state of mind necessary to enter into a valid marriage, neither court was confronted with the issue relevant here of the applicability of FRE 804(b)(4).

intricacies of the immigration system, and the affidavits were tendered in support of the argument that they were intimately familiar. Indeed, the government has never argued that admission of the affidavits, if error, was harmless. We conclude that the convictions must be reversed.

It consequently is unnecessary to resolve the remaining issues on appeal. The affinity between the hearsay rules and the Sixth Amendment's Confrontation Clause has indeed been remarked upon on appropriate occasions. *E.g., Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980).

The two inquiries, however, are not necessarily identical. This court has observed that "the question that arises under the Rules of Evidence is not necessarily the same as that presented under the Confrontation Clause". *United States v. Murphy,* 696 F.2d 282, 286 (4th Cir.1982). Therefore, we defer, until necessity compels, discussion of the implications of the Confrontation Clause in a situation like the one here presented.

### IV.

We decide today not whether there was enough evidence to convict the Carvalhos, but whether they were tried fairly. Although the affidavits contained potentially weighty evidence on the issue of knowledge, it is by no means implausible that, even had they been excluded, the remaining evidence, particularly with respect to the Carvalhos' actions during the "interviews" with Agent Valladolid, would still have been sufficient to sustain a conviction.

The prosecution, however, opted to pursue a strategy of overkill, striving to put before the jury every piece of evidence it could amass, with little regard to countervailing concerns of fairness and undue prejudice.[10] The government not only lessens

its chances for retaining convictions on appeal when it offers evidence of dubious worth, but, in operating as if the attainment of convictions were desirable at any cost, it ignores the telling words of the Supreme Court in *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963):

> Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly.

REVERSED.

K.K. HALL, Circuit Judge, dissenting:

I cannot agree with the majority's conclusion that appellants were deprived of their right to a fair trial. In my view, the trial court properly admitted the affidavits of appellants' former spouses into evidence. For this reason, I dissent.

On their face, all three affidavits were well within the scope of the personal or family history exception to the hearsay rule, as contemplated by F.R.E. 804(b)(4). Moreover, Cruz and Hernandez both knew that their sworn statements were being taken by INS investigators to determine whether there had been any violations of immigration laws, including criminal violations. The statements given by Cruz clearly implicated her as a willing accomplice to a criminal violation of these laws, and, as such, fell within the scope of F.R.E. 804(b)(3) as a statement against her penal interest. The trial judge also had a basis for admitting the Hernandez affidavit as a statement against his penal interest because it revealed that his marriage to Martha Sanchez (now Carvalho) had ended long before he filed the petition for permanent residency on her behalf. As we noted in *United States v. MacDonald,* 688 F.2d 224,

---

10. The same strategy presumably led the government to persist in linking the Carvalhos to Fernando Rodriguez, the initial object of Agent Valladolid's search, and referring to Fernando Carvalho's efforts to collect unemployment benefits. The government apparently believed it prudent and necessary to paint a gener-

al picture of the Carvalhos as people with a propensity to defraud the system and associate with criminals. While we need not decide whether actions such as these amounted to prosecutorial misconduct, we decry the prosecution's repeated decision to err on the side of overkill, rather than fairness.

233 (4th Cir.1982), "our role in reviewing decisions at *nisi prius* construing Rule 804(b)(3) is a limited one. We must uphold the trial court unless it has abused its discretion." Unlike the majority, I can find no abuse of discretion or error of law in the admission of the three affidavits.

Furthermore, the record reflects that this evidence was admitted for the limited purpose of showing appellants' knowledge of immigration laws and procedures.[1] Appellants were charged in this case with using counterfeit alien registration cards. Their knowledge that the cards were counterfeit was crucial to the jury's determination of guilt or innocence. Both appellants had a history of prior dealings with the INS and, as the majority notes, both had disappeared once before when they were ordered deported. The affidavits, which alluded to the Carvalhos' earlier attempts to secure permanent resident status by marrying United States citizens, were highly relevant to show appellants' knowledge of immigration requirements and to rebut their "uncontradicted" testimony that they believed their cards were genuine.

Principles of trial fairness extend to the prosecution as well as criminal defendants. How else in such cases can the government attempt to rebut subjective statements of intent other than as it did here by showing the inconsistency between defendants' testimony and their previous mode of conduct? The Carvalhos' past actions belied their testimony and the jury clearly had a right to hear this rebuttal evidence.

One final point: the majority complains of "overkill" by the prosecution for introducing too much evidence; however, it concedes that, apart from the affidavits, the remaining evidence may indeed be sufficient to sustain the convictions. At the same time the majority also concludes that the admission of the affidavits was not harmless error, merely stating that the government has never argued harmless error and that the affidavits were connected with the crucial trial issue of appellants' knowledge. I am not persuaded. The majority has not demonstrated, at least to my satisfaction, that in the total setting of the case the admission of the affidavits had substantial influence on the jury's verdict.

Because I am satisfied that the trial judge in this case properly admitted the affidavits, and finding no error otherwise in the proceedings below, I would affirm appellants' convictions.

---

1. F.R.E. 404(b) provides that:
    Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.