In re the MARRIAGE OF Raymond J. TULLIER and Elizabeth A. Tullier.

Raymond J. Tullier, Appellant,

v.

Elizabeth A. Tullier, Respondent.

No. 22290.

Missouri Court of Appeals, Southern District, Division One.

March 17, 1999.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 6, 1999.

Application to Transfer Denied June 1, 1999.

Eric A. Farris, Branson, for appellant.

Randy S. Anglen, Branson, for respondent.

CROW, Judge.

Raymond J. Tullier appeals from a judgment dissolving his marriage to Elizabeth A. Tullier. His two points relied on attack only the trial court's division of property; consequently, this opinion sets forth only the evidence pertinent to those complaints.

Raymond[1] married Elizabeth September 6, 1975.

Raymond's uncontradicted testimony revealed he received a "personal injury award ... toward the end of June of 1990." Asked the amount, Raymond replied: "It was two hundred and fifty-two thousand, five hundred

---

1. For brevity and clarity, this opinion refers to the parties by their respective forenames. No disrespect is intended.

and some-odd dollars." This opinion henceforth refers to that sum as "the 1990 recovery."

The dissolution trial occurred February 18, 1998, some seven years and eight months after the 1990 recovery.

At trial, Raymond identified Exhibit R–1 as a statement of his "Merrill Lynch account." Exhibit R–1 covers the period from "11/29/97 to 12/31/97." It is denominated "Priority Client Cash Management Account" and displays the names "MR RAYMOND J TULLIER AND MRS ELIZABETH J [sic] TULLIER JTWROS."[2] One area on the exhibit is designated "Monthly Portfolio Summary." It shows assets classified as corporate bonds, equities, and mutual funds. The aggregate market value of those assets is shown as $289,855 plus estimated accrued interest of $688. Exhibit R–1 also shows a "Debit Balance" of $109,665, leaving a "Net Portfolio Value" of $180,878.

Raymond avowed that all of the assets in the Merrill Lynch account came from the 1990 recovery. Explaining the $109,665 "Debit Balance" on Exhibit R–1, Raymond recounted that Elizabeth withdrew $100,000 from the account as a "margin loan" and used some of the money to buy a house in Berryville, Arkansas. According to Raymond, the house was to be "titled to us." However, said Raymond, the name placed on the deed was that of Elizabeth's mother: Elizabeth G. Dunn ("Mrs.Dunn").

Mrs. Dunn, called as a witness by Raymond, confirmed the house was in her name; she and her husband occupy it. As this court comprehends Mrs. Dunn's testimony, the house was bought in May or June of 1997. Mrs. Dunn's testimony continued:

"Q. . . . Did [Elizabeth] tell you where the money came from to buy that house?

A. Yes.

Q. Where did that money come from?

A. Her share of the—getting a divorce. . . . I was told by her . . . that it was in my name but she had made

arrangements after the divorce for it to be turned over to her."

Mrs. Dunn revealed that at one time, Elizabeth and her "boyfriend" resided in the house together with Mrs. Dunn and her husband. Mrs. Dunn also disclosed that a lawsuit is pending against her by Elizabeth in Arkansas wherein Elizabeth has "asked that the house be transferred back to her."

Raymond, age 46 at time of trial, testified that the incident which resulted in the 1990 recovery occurred when he was 39. He was working as an automobile mechanic when a grinding wheel exploded and hit him in the face. He lost his left eye and suffered facial injuries. His residual health problems from those injuries include blackouts, nausea and memory loss.

On cross-examination, Raymond recalled that when he "settled" the claim for those injuries, he received a check. He did not remember whether Elizabeth had to "sign" the check, nor did he recall whether any of the amount was for "loss of consortium." He did, however, recollect: "[T]here was an issue raised back then that she was going to . . . try to be part of the . . . lawsuit because of that. And as it turned out, we settled. We didn't . . . go to trial."

Describing the economic consequences of the accident, Raymond testified:

"Q . . . . you haven't worked since the time of that accident; is that correct?

A. That's correct.

Q. And what is the form of your income?

A. I get SSI and I've got a long-term disability policy with CIGNA.

Q. Okay. How much do you get in SSI per month?

[A.] . . . Eight twenty-five, I think, a month.

Q. Okay. And then how much for the disability policy?

A. CIGNA is $434."

Raymond avowed that had he not been injured, he would have worked until age 65.

---

**2.** "JTWROS" is the common acronym for joint tenants with right of survivorship. *In re Estate* of *Hayes,* 941 S.W.2d 630, 633 (Mo.App. E.D. 1997).

Raymond maintained in the trial court that the 1990 recovery should be considered his separate property in that the recovery was "a replacement of his lost eye, lost memory, and lost future wages."

At the conclusion of the evidence, the trial court announced it needed "further evidence concerning ... a valuation of the Merrill Lynch account as of today's date rather than December 31st of '97 ... and the disposition of the personal injury settlement." The trial court set a date for a "further evidentiary hearing" on those subjects and others.

On the appointed date, Raymond's lawyer presented an exhibit showing the aggregate market value of the assets in the Merrill Lynch account as of January 30, 1998, was $289,332 plus estimated accrued interest of $427. The "Debit Balance" as of that date was $110,169, leaving a "Net Portfolio Value" of $179,590.

The trial court pointed out there was no additional evidence concerning the 1990 recovery.

Raymond's lawyer responded:

"Judge, we have no paper trail of that. We just have his ... oral testimony as to the amount of that settlement and what that settlement was for. We were unable to locate any statements ... in regards to any of that."

The trial court replied:

"I would just point out to you now, because it may save considerable amount of oral argument, that I don't think there's sufficient evidence for me to make a determination as to how much of that settlement is for wages and how much is for reimbursement for injury or medical expenses or loss of consortium or whatever else may be the claim. I don't think there's sufficient evidence in the record for me to make that determination."

The trial court found the parties had "net marital assets" totalling $531,000.[3] The judgment included this:

"[Raymond] deposited the balance of his personal injury settlement into the jointly held Merrill Lynch account. He claims that the settlement incuded [sic] an undetermined sum as an award for future lost wages. [His] trial brief asserted that the Merrill Lynch account should by [sic] treated as his separate property. Although the court agrees that Missouri has adopted the analytic approach in characterizing a personal injury award per *Mistler v. Mistler*, 816 S.W.2d 241 (Mo.App. 1991), there was insufficient evidence presented to make that determination in this case. The Merrill Lynch account is jointly titled and the parties used the account for joint living expenses since the settlement. In order to equalize the distribution of marital property [Raymond] is awarded $76,100.00 (42.37%) from that account and [Elizabeth] is awarded 103,490.00 (57.63%) from that acount [sic]. Each party remains jointly and severally liable for the account debt, with [Raymond] to pay 42.37% and [Elizabeth] to pay 57.63% of the debt[.]

This distribution divides total net marital assets of $531,000.00 between the parties, with $265,500.00 (50%) awarded to [Raymond] and $265,500.00 (50%) awarded to [Elizabeth]."

Raymond's first point relied on:

"In its judgment of dissolution of marriage in which the court ordered the division of property, the trial court erred in classifying all of the assets from [Raymond's] personal injury award as marital property rather than all or a substantial portion as [his] separate property because, pursuant to the analytic method of classification of property, [he] established that all or a substantial portion of the assets were [his] separate property in that [he] presented clear and convincing evidence that the assets from the award were for [his] lost eye, disability, and for future lost wages."

■ The "analytic method" of classifying money recovered by a spouse in a claim for bodily injuries sustained during marriage

---

**3.** Included in the trial court's list of marital property was an asset described as: "Suit pending in AR re: title to [the Berryville, Arkansas, house]."

The trial court valued that asset at $87,000 and included it in the marital property awarded Elizabeth.

is explained in *Mistler*, 816 S.W.2d at 241, cited in the excerpt from the trial court's judgment (quoted earlier). Under that approach, the purpose for which the recovery is received controls its classification. *Id.* at 247. A recovery, or portion thereof, is classified as that which it is intended to replace. *Id.* To the extent the recovery compensates for losses to the marital estate, it is marital property. *Id.* To the extent the recovery compensates for losses to a spouse's separate estate, it is his or her separate property. *Id.*

In *Mistler*, the issue, as set forth in the opinion, was whether post-dissolution annuity payments to the husband replaced only his post-dissolution noneconomic and economic damages and, therefore, were properly designated as nonmarital property by the trial court. *Id.* The appellate court, upon review of the record, held the trial court's designation was correct. *Id.* at 252.

Other cases illustrate how the analytic method enables courts to classify bodily injury recoveries as marital or nonmarital property in dissolution actions.

In *Hudson v. Hudson*, 865 S.W.2d 405 (Mo.App. W.D.1993), the husband was injured on the job; the injury left him unable to resume his occupation. *Id.* at 407. One of the fringe benefits of his job at the time of his injury was a "Supplemental Fund" administered by his union. *Id.* at 406. The husband was entitled to payments from the fund upon becoming totally and permanently disabled from performing union work. *Id.* at 407. He argued the payments were to compensate him for lost future earning capacity (and thus nonmarital property); his wife insisted the payments were a retirement plan (and thus marital property). *Id.* The appellate court held there was sufficient evidence to support the trial court's finding that the payments were to compensate the husband for lost future earning capacity, hence the trial court did not err in classifying such payments as nonmarital. *Id.* at 407–08.

In *Pauley v. Pauley*, 771 S.W.2d 105 (Mo. App. E.D.1989), the issue was whether a "lump sum" award of workers' compensation benefits and an award against the Second Injury Fund were marital property. *Id.* at 107. Applying the analytic approach, the appellate court held "the lump sum awards to husband of workers' compensation benefits and of the Second Injury Fund are non-marital assets to be set aside to husband as his separate property to the extent these awards compensate husband for future loss of earnings that have accrued since the dissolution of the parties' marriage." *Id.* at 109–10. However, the portion of the awards that compensated the husband for wages lost during the marriage are marital property, as they replaced wages he would have earned before the dissolution had he not been injured. *Id.*

In *Heslop v. Heslop*, 967 S.W.2d 249 (Mo. App. W.D.1998), the issue was whether a sum received by the husband in settlement of a claim under the Federal Employers' Liability Act was marital property. *Id.* at 250. The appellate court recognized the "statutory presumption" (inferably § 452.330.3, RSMo 1994) that all property acquired during marriage is marital property. *Id.* at 254. Consequently, the husband was required to prove by clear and convincing evidence that a portion of the settlement was nonmarital. *Id.* Upon reviewing the evidence, the appellate court held the husband "did not establish that any of the monies he received in settlement were for future lost earnings." *Id.* Consequently, the appellate court denied the husband's contention that a portion of the award was nonmarital. *Id.*

■ In the instant case there was evidence that Raymond was earning "around $16,000" per year at the time he was injured. If (1) he had not been injured, and (2) he had continued to earn $16,000 per year until entry of the dissolution judgment, he would have earned some $128,000 during that eight-year period. Such earnings would have been marital property. *Doyle v. Doyle*, 786 S.W.2d 620, 622[3] (Mo.App. S.D.1990). Consequently, under the analytic method of classifying recoveries, there was evidence that at least half the 1990 recovery was marital property, as said portion replaced wages Raymond would have earned before the dissolution.

There was no evidence as to how much of the 1990 recovery was for medical expenses;

however, Raymond testified he went to "specialists" to find out why he was having blackouts. He also revealed "they did an MRI" to determine whether he had "carotid artery damage because it was a facial injury." Obviously, those events resulted in medical expenses during the marriage.

Additionally, there was evidence that some portion of the 1990 recovery may have been attributable to a potential claim by Elizabeth for loss of consortium.

Significantly, nowhere in Raymond's first point or the argument following it does this court find any hint as to what portion of the 1990 recovery replaced earnings Raymond would have earned after dissolution of the marriage. Raymond tells this court only that "all or a substantial portion" of the award should have been classified as his separate property.

The trial court aptly noted the insufficiency of the evidence to establish what portion, if any, of the 1990 recovery was intended to replace future earnings Raymond will lose after dissolution of the marriage. In that regard, the instant case is like *Heslop,* 967 S.W.2d at 254 (discussed earlier).

Because (a) at least half the 1990 recovery apparently replaced earnings Raymond lost during the marriage, (b) some portion of the 1990 recovery obviously reimbursed Raymond for medical expenses incurred during the marriage, (c) some portion of the 1990 recovery may have been attributable to Elizabeth's potential claim for loss of consortium, (d) the burden was on Raymond to prove what portion of the 1990 recovery was intended to replace wages he would have earned after the dissolution, and (e) there was insufficient evidence to satisfy that burden—even after the trial court called the deficiency to Raymond's attention and gave him an opportunity to present additional evidence at the second hearing—this court holds the trial court did not err in refusing to classify some portion of the 1990 recovery as Raymond's separate property.

It may have occurred to an alert reader that even had Raymond demonstrated that a specific part of the 1990 recovery was intend-ed to replace wages he would have earned after the dissolution, such proof would have been futile because of the way Raymond handled the 1990 recovery. This court has held:

> "The placing of separate property of a spouse into the joint names of both spouses creates a presumption that the property transferred becomes marital property, and clear and convincing evidence is required to show that the transfer was not intended as a gift. *Spidle v. Spidle,* 853 S.W.2d 311, 314 (Mo.App. S.D.1993); *Stephens v. Stephens,* 842 S.W.2d 909, 913 (Mo.App. S.D. 1992); *Hankins v. Hankins,* 823 S.W.2d 161, 162 (Mo.App. W.D.1992)."

*In re Marriage of Jennings,* 910 S.W.2d 760, 763[4] (Mo.App. S.D.1995).

■ In the instant case the trial court found Raymond deposited the balance of the 1990 recovery in the Merrill Lynch account—an asset owned by Raymond and Elizabeth as joint tenants with right of survivorship.[4] The trial court further found the parties used the account for joint living expenses.

Raymond does not challenge those findings. Under *Jennings,* 910 S.W.2d at 763[4], those findings gave rise to a presumption that the 1990 recovery became marital property. Raymond presented no evidence to rebut that presumption.

For all of the reasons heretofore set forth, this court finds no merit in Raymond's first point. It is denied.

■ Raymond's second point, presented as an alternative to his first, avers the trial court erred in dividing the marital property equally. According to Raymond, that ruling "was inequitable and contrary to [§] 452.330.1 ... in that [Elizabeth] had squandered, secreted, and misused marital funds, had purchased a residence in Berryville, Arkansas, had had an affair with her boyfriend, had told [Raymond] of her thoughts of killing him, and in that [Raymond] was a disabled spouse."

Raymond emphasizes that one of the statutory factors a trial court must consider in dividing marital property is the conduct of

4. Footnote 2, *supra.*

the parties during the marriage. § 452.330.1(4), RSMo Cum.Supp.1997. Raymond insists that Elizabeth's misconduct mandated an award to him of a greater share of the marital property.

Elizabeth's purchase of the Berryville house is recounted earlier in this opinion. Raymond testified Elizabeth paid $87,500 for it. The $87,500 apparently came from the $100,000 "margin loan" Elizabeth obtained from the Merrill Lynch account.

Apart from Raymond's testimony that he considered $60,000 a "fair price" for the house, there was no evidence that $87,500 was an inflated price. Thus, the trial court could have reasonably found the evidence showed, at most, that Elizabeth may have "squandered" only $12,500 of the $100,000 "margin loan." While that is a sizable sum, it is but two percent of the $531,000 marital estate.

The trial court could also have reasonably found Elizabeth "squandered" none of the $12,500. There was evidence that Elizabeth was not employed after August 1990, hence the trial court could have inferred Elizabeth used the $12,500 for living expenses while separated from Raymond.

As to Elizabeth's affair with her "boyfriend," the nebulous evidence indicates the affair may have occurred during one of the parties' separations. The evidence does not reveal the duration of the affair; however, it is inferable that Elizabeth and Raymond resumed cohabitation after the affair.[5]

Testimony that Elizabeth thought about killing Raymond came from Raymond. He recounted that Elizabeth told him she was concerned that he would commit suicide. He also testified that after she left him "the first time," she came back and told him she had paced his bedroom floor many times while he was asleep, wondering how she could kill him and "get away with it."

The trial court, of course, was not compelled to believe Raymond's testimony. In this judge-tried case, credibility of the witnesses and the weight to be given their testimony was a matter for the trial court, which was free to believe none, part, or all of the testimony of any witness. *Herbert v. Harl*, 757 S.W.2d 585, 587[1] (Mo. banc 1988).

Furthermore, Raymond ignores the evidence of his own misconduct. Mrs. Dunn—Raymond's witness—testified that "over 21 years, [Elizabeth's] been telling me all the things [Raymond's] been doing to her." Mrs. Dunn added that when she asked Elizabeth why she did not leave Raymond, Elizabeth replied: "Well, if I leave him, he's going to kill me.... [T]here's no place in the United States I can go to that he won't find me." Asked specifically what Raymond had done to Elizabeth, Mrs. Dunn replied: "[S]he told me that he raped her."

Mrs. Dunn's testimony, although hearsay, was received without objection. Hearsay, if not objected to, may be considered along with other evidence. *Rooney v. Lloyd Metal Products Co.*, 458 S.W.2d 561, 566 (Mo.1970); *Thorpe v. Meier*, 755 S.W.2d 683, 691[4] (Mo.App. S.D.1988). The probative worth and value of such evidence is for the trier of the facts. *Canania v. Director of Revenue*, 918 S.W.2d 310, 313[4] n. 2 (Mo.App. S.D.1996); *Thorpe*, 755 S.W.2d at 691.

The trial court's judgment recites that the court, in dividing the marital property, considered, *inter alia*, the conduct of the parties during the marriage. Inasmuch as the trial court divided the marital property equally, this court infers the trial court concluded both parties misbehaved and neither's misdeeds, measured against the other's, were excessive enough to warrant an unequal division of marital property.

As to Raymond's contention that he is a "disabled spouse" (and therefore entitled to a larger share of marital property than Elizabeth), this court notes that Raymond's

---

5. This court gathers from the enigmatic record that sometime after Elizabeth and her "boyfriend" ceased residing in the Berryville house, Elizabeth and Raymond got "back together." Raymond's petition alleged the parties separated on or about November 6, 1997. Elizabeth's an- swer admitted that allegation. This court deduces from the cryptic evidence that November 6, 1997, was several months after Elizabeth and her "boyfriend" had lived in the Berryville house.

"SSI" is $825 per month; his CIGNA "disability policy" pays him $434 per month. He thus has monthly income of at least $1,259, which amounts to over $15,000 per year.

As reported earlier in this opinion, there was evidence Raymond was earning approximately $16,000 per year at the time he was injured. It thus appears his annual income dropped by $1,000 after the injury. While one might assume Raymond's standard of living declined after his injury, his testimony refuted that notion:

> "Q. . . . You were living with your wife after the accident until the time you separated in the spring or summer of '97, right?
>
> A. Right.
>
> Q. And you all didn't live quite as well as before when you were earning a wage; is that correct?
>
> A. Oh, no. That's—That's wrong. We lived better.
>
> Q. You lived better?
>
> A. Yes, sir."[6]

Furthermore, marital property awarded Raymond by the trial court included a 49–acre tract in Stone County on which a house is situated. Raymond valued that asset at $163,000. This court infers Raymond was residing there at time of trial.

The trial court also awarded Raymond two motor vehicles, a boat and trailer, a Suzuki "four-wheeler," furniture, guns, tools, housewares and, as noted earlier, a share of the Merrill Lynch account.

It appears Raymond will have perpetual income from "SSI," CIGNA and his share of the Merrill Lynch account. Thus, although apparently unemployable, Raymond will continue to receive almost the same income after the dissolution as before and—unlike before—he will be the only one living off it.

 A trial court is vested with considerable discretion in dividing marital property; an appellate court will interfere only if the division is so heavily and unduly weighted in favor of one party as to amount to an abuse of discretion. *Dardick v. Dardick*, 670

S.W.2d 865, 869[5] (Mo. banc 1984). Judicial discretion is abused when a trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration; if reasonable persons can differ about the propriety of the trial court's ruling, it cannot be said the trial court abused its discretion. *State ex rel. Webster v. Lehndorff Geneva, Inc.*, 744 S.W.2d 801, 804[1] (Mo. banc 1988).

Applying the standard of review set forth in the preceding paragraph, this court holds the trial court did not abuse its discretion in dividing the marital property in this case.

Raymond's second point is denied and the judgment is affirmed.

PREWITT, P.J., and PARRISH, J., concur.

---

6. This court suspects the reason the parties lived better is that investment income from the Merrill

Lynch account enhanced their disposable income.