Teresa Ann **HENDERSON**, Appellant,

v.

The **STATE** of Texas, State.

No. 2–99–528–CR.

Court of Appeals of Texas, Fort Worth.

March 7, 2002.

Rehearing Overruled May 23, 2002.

David J. Escobar, Fort Worth, for Appellant.

Tim Curry, Crim. D.A., Charles M. Mallin, Asst. Crim. D.A. and Chief of Appellate Div., Debra Ann Windsor, David Montague, Asst. Crim. D.A.'s, Fort Worth, for Appellee.

Panel B: DAY and DAUPHINOT, JJ.; and DAVID L. RICHARDS, J.

## OPINION

DAVID L. RICHARDS, Justice (Assigned).

Appellant was convicted of the offense of capital murder in connection with the death of her three-year-old stepson, John Henderson. The head injury causing the death occurred at a time when the child was in appellant's care at their residence. The disputed issues at trial concerned appellant's intent and the manner and means of death. The State waived the death penalty and, following appellant's conviction, she was sentenced to life imprisonment.

Four points are presented on appeal: (1) the trial court erred in admitting testimony of Dr. David Donahue concerning the forces necessary to cause the victim's injury; (2) the trial court erred in admitting the testimony of Dr. Howard Kefler concerning the forces necessary to cause the victim's injury; (3) the trial court wrongly excluded a written statement provided to police authorities by the victim's father; and (4) the trial court erred in failing to grant appellant's motion for directed verdict. We will affirm.

Points one and two challenge the testimony of Dr. David Donahue and Dr. Howard Kefler concerning the forces necessary to cause the injury resulting in the victim's death. Appellant's specific complaints challenge the reliability of the doctors'

opinions that the force causing the child's massive brain injury and death was not consistent with appellant's assertion that the injury was the accidental result of a short fall onto a bedroom dresser after she struck the child in the mouth.

■ Reviewing courts will not disturb the trial court's determination that a witness is or is not qualified as an expert unless a clear abuse of discretion is shown. *Morales v. State,* 32 S.W.3d 862, 865 (Tex. Crim.App.2000). Consequently, the court will not conclude the trial court has abused its discretion if, in the same circumstances, it would have ruled differently or if the trial court committed a mere error in judgment. *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 558 (Tex.1995). Instead, we are to gauge an abuse of discretion by determining whether the trial court acted without reference to any guiding rules or principles. *Id.*

■ Under evidentiary rule 702, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Tex.R. Evid. 702. This rule imposes a special gatekeeping obligation on the trial court to ensure the reliability of all expert testimony. *Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 722–26 (Tex.1998). The trial judge fulfills this obligation by determining as a precondition to admissibility that: (1) the putative expert is qualified as an expert; (2) the expert's testimony has a reliable basis in the knowledge and experience of the relevant discipline; and (3) the testimony is relevant. *Robinson,* 923 S.W.2d at 556. A valid connection to the pertinent inquiry is a necessary precondition to admissibility. *See Daubert v. Merrell Dow Pharms., Inc.,*

509 U.S. 579, 591–92, 113 S.Ct. 2786, 2795–96, 125 L.Ed.2d 469 (1993) (stating factors that would be helpful are whether scientific method can be or has been tested, whether it has been subjected to peer review and publication, what the known or potential rate of error is, and whether it has attained general acceptance in the field).

■ The role of the trial court in qualifying experts is to ensure "that those who purport to be experts truly have expertise concerning the actual subject about which they are offering an opinion." *Broders v. Heise,* 924 S.W.2d 148, 152 (Tex. 1996). The party offering the experts testimony bears the burden to show the witness possesses "special knowledge as to the very matter on which he proposes to give an opinion." *Id.* at 152–53.

In *Nenno v. State,* 970 S.W.2d 549, 560 (Tex.Crim.App.1998), *overruled on other grounds by State v. Terrazas* 4 S.W.3d 720, 727 (Tex.Crim.App.1999), the Texas Court of Criminal Appeals acknowledged that the *Daubert* inquiry is "flexible," and noted that there is general agreement among the federal courts that: (1) the gatekeeping function of trial judges regarding the reliability of expert evidence applies to all forms of expert testimony; and (2) the *Daubert* factors "do not necessarily apply outside the hard science context." *Id.* at 561. The court emphasized that "methods of proving reliability will vary, depending upon the field of expertise" and recognized:

> When addressing fields of study aside from the hard sciences, such as the social sciences or fields that are based primarily upon experience and training as opposed to the scientific method, Kelly's requirement of reliability applies but with less rigor than to the hard sciences. To speak of the validity of a "theory" or

"technique" in these fields may be roughly accurate but somewhat misleading.

*Id.*

The court also noted that the *Daubert* "factors" apply to hard science but not to expert testimony involving clinical medicine. *Id.* at 561 (citing *United States v. Jones*, 107 F.3d 1147, 1156, 1158 (6th Cir.), *cert. denied*, 521 U.S. 1127, 117 S.Ct. 2527, 138 L.Ed.2d 1027 (1997) and *Freeman v. Case Corp.*, 118 F.3d 1011, 1016 n. 6 (4th Cir.1997), *cert. denied*, 522 U.S. 1069, 118 S.Ct. 739, 139 L.Ed.2d 676 (1998)). Concerning *Freeman*, the court ruled that where an expert relies on his experience and training and not a particular methodology to reach his conclusions, the *Daubert* "analysis" is inappropriate. *See Nenno*, 970 S.W.2d at 561.

We believe the doctors' testimony here falls into the clinical medicine category, as opposed to a "hard" science category. The testimony established that Dr. Donahue is a board-certified pediatric neurosurgeon. Similarly, Dr. Kelfer is board certified in pediatric neurology and general pediatrics. Their testimony at the *Daubert* hearing supports the State's contention that the subject matter of their testimony was within both doctors' fields of practice. Both were proven to have training and experience in dealing specifically with head injuries to children and both testified that determining what caused an injury was a regular part of their practice. In fact, Dr. Kefler testified that he was called by the hospital personnel to evaluate the child's brain damage in the instant case in an attempt to determine its cause. Dr. Donahue disputed defense counsel's characterization of such an endeavor as "forensic," explaining that determining the cause of injury was a part of his training, practice, and experience, and a vital part of clinical medicine.

Similarly, while Dr. Kefler admitted that he was not trained in forensics or forensic pathology, it was a regular part of his practice to make determinations as to the cause of injuries. Also, the testimony of both doctors was shown to be predicated upon and to utilize the principles involved in their fields. Both explained that their opinions were based on the various tests, examinations, and treatments given to the victim. Finally, both indicated they had referred to studies and literature in the field in reaching their conclusions. Given the above predicates, we conclude the trial court did not abuse its discretion in ruling their testimony was admissible. Points one and two are overruled.

In point three, appellant complains of the trial court's decision excluding the following written statement provided to police authorities by her husband, William Henderson:

My wife, Teresa A. Henderson, and myself have discipline [sic] our three children in the following way.

We usually start with time out. The duration of time out depended on the way the child reacted in time out. The rule was that you do not move or talk in time out. If a child did move or talked, we either left them in time out longer. If the child persisted, they were told to turn around and were either spanked on the butt or slapped on the cheek or mouth. Never severely. A belt was sometimes used but only on the butt. Never the head.

If a child talks back, they were slapped on the cheek or mouth and again not severely. Telling a lie was the same.

Jake had problems eating at some meals. He would intentionally hold food in his mouth for hours. At this point, we would tell him to chew and swallow.

If he didn't he would get a slap on the cheek and then he would usually swallow. A few times, he would get a light slap on his leg. None of this was ever done for amusement or intentional and never severe.

His pottie training was handled lightly. He would get time out if he wet his pants and that was it.

A majority, about 95% of the spanking was done by hand. A belt was only used in severe cases and never to injure the child.

In closing[,] I would like to say that our disicpline [sic] policy was not a good policy. But, we never, especially my wife, abused our children. Although I was not present at the time of the offense, I believe as god as my witness, that what happen [sic] was an accident with a tragic ending. In one day I have lost my son, the support of my family, and most likely, my other son. But I stand by my wife and will always say that she would never intentionally hurt or injure or kill any child. I bear no grudge and pray for release.

■■■ As in the preceding points, we cannot overturn the trial court's ruling absent a holding that the trial court abused its discretion. *Bolden v. State*, 967 S.W.2d 895, 898 (Tex.App.-Fort Worth 1998, pet. ref'd). Appellant contends the trial court's ruling constituted an abuse of discretion because the statement qualified as an exception to the hearsay rule-a statement of family history concerning the death of his son. The rule provides:

(3) Statement of Personal or Family History

(A) A statement concerning the declarant's own birth, adoption, marriage, divorce, legitimacy, relationship by blood, adoption, or marriage, ancestry, or other similar fact or personal or family history even though the declarant had no means of acquiring personal knowledge of the matter stated; or

(B) A statement concerning the foregoing matters, and death also, of another person, if the declarant was related to the other by blood, adoption, or marriage or was intimately associated with the other's family as to be likely to have accurate information concerning the matter declared.

TEX.R. EVID. 804(b)(3)

■■■ The rule, which is identical to its federal counterpart, rests on the assumption that the type of declarant specified by the rule will not a make a statement, such as a date of a marriage or the existence of a ceremony, unless it is trustworthy. *See U.S. v. Carvalho*, 742 F.2d 146, 151 (4th Cir.1984). Here, the declarant provided far different information than the matters set forth in the rule. Summarized, his statement concerned methods of child discipline practiced in the home and asserted the "fact" that his wife would not intentionally have caused the death of their son. Rule 804(b)(3) does not apply where the matter asserted by the declarant involves nontrustworthy "facts" such as state of mind. *See id.* (holding exception inapplicable where declaration went to issue concerning couple's motive for marriage). Point three is overruled.

■■■ In point four, appellant contends the trial court erred in denying her motion for instructed verdict. Her specific complaint concerns the lack of evidence supporting paragraph six of the indictment, in which the state alleged that she knowingly caused the victim's death by causing him to strike an object unknown to the grand jury. The indictment alleged alternative manners and means in separate paragraphs. In one paragraph, the state alleged appellant caused the child to strike an object unknown to the grand jury. Ap-

pellant moved for a directed verdict on grounds the State had failed to prove the object the child struck was unknown to the grand jury.

■ A complaint that the trial court erred in overruling a motion for directed verdict is actually an attack upon the legal sufficiency of the evidence. *See McDuff v. State*, 939 S.W.2d 607, 613 (Tex.Crim. App.), *cert. denied*, 522 U.S. 844, 118 S.Ct. 125, 139 L.Ed.2d 75 (1997). Here, alternative theories of manner and means were submitted to the jury; however, appellant's challenge on appeal concerns only one of those theories. Appellant does not contend the evidence is insufficient under the other theories submitted. Because we are required to uphold the sufficiency of the evidence if the evidence is sufficient to convict under any of the allegations submitted, point four is overruled. *See id.*

■ Moreover, appellant's point fails on its merits. A prima facie showing is made that the weapon was unknown to the grand jury where the evidence does not establish the type of weapon used. *Hicks v. State*, 860 S.W.2d 419, 424 (Tex. Crim.App.1993), *cert. denied*, 512 U.S. 1227, 114 S.Ct. 2725, 129 L.Ed.2d 848 (1994). Here, there was some circumstantial evidence that the child's head was struck against something other than the dresser because the dresser had many undisturbed figurines and other fragile items still in place following the injury. Moreover, given the large number of injuries to the child's face, the medical examiner opined that it was likely the injury was caused by multiple blows to the child's head. Point four is overruled.

The trial court's judgment is affirmed.

DAUPHINOT, J. filed a dissenting opinion.

LEE ANN DAUPHINOT, Justice, dissenting.

I must respectfully dissent to the majority's holding that the trial court did not abuse its discretion in allowing Dr. Donahue and Dr. Kefler to testify "concerning the forces necessary to cause the injury resulting in the victim's death." These doctors did not confine their testimony solely to their observations gleaned from studying the "various tests, examinations, and treatments given to the victim"; rather, they ranged freely into speculation regarding causation and Appellant's culpable mental state.

The majority correctly points out that "[t]he role of the trial court in qualifying experts is to ensure 'that those who purport to be experts truly have expertise concerning the actual subject about which they are offering an opinion' " by requiring the party offering the expert's testimony to show that the witness possesses "special knowledge as to the very matter on which he proposes to give an opinion." The majority then justifies the admission of both doctors' testimony on the basis that, because their testimony "falls into the clinical medicine category, as opposed to a 'hard' science category," we must be "flexible" to the point of requiring no actual expertise on the part of expert witnesses in the specific area about which they are offering their opinions.

Not only did Dr. Kefler deny having any expertise or training in the field of forensic pathology, but he also specifically testified outside the presence of the jury that he did not know the degree of force necessary to cause the child's injuries. He stated, "I don't, nor is that my area of expertise to know the physics or the forensic pathology of what would cause this exact sort of injury." Indeed, Dr. Kefler acknowledged that he could not quantify the type of force that would be required to cause the inju-

ries sustained in this case, stating, "That is not my area of expertise as a clinical physician." While he testified that there were studies dealing with this particular subject, he did not know what they were. Despite this evidence concerning his qualifications, however, Dr. Kefler was permitted to testify before the jury to the degree of force necessary to inflict the injury suffered by the child. Specifically, Dr. Kefler testified in pertinent part as follows:

> [T]here are different kinds of head injuries that children sustain. There is a child who can just fall or hit a soccer ball and have a little loss of the consciousness and that wouldn't cause injury like this.
>
> Just an injury to the—pop to the head because you are upset with him wouldn't cause an injury like this.
>
> This is more what I call brute force, something that-like I said, it wouldn't just be a fall on to a carpeted floor, fall off a bed or against a dresser.
>
> You know, it's sort of an injury that you see when the child is coming in after a car wreck, when there has been all sorts of forces hit the head, from the hitting against the dashboard.
>
> If it's a fall, it would have to be a fall from a several story building. I have seen children who have fallen off a balcony from several stories up that had an injury like this.
>
> If a person inflicted it, it's not the sort of thing that anybody would do just to give a little physical punishment to a child. It's more of a violent thing.
>
> . . . .
>
> It's—it wouldn't be the sort of-sort of mild physical punishment that someone might give and then have the child go stand in the corner for 15 minutes.
>
> It would be—you know, I can imagine someone picking a child up by the ankles and whamming them against the side of the bathtub, that sort of thing, if you didn't have any sort of instrument, or just a blunt blow to the head using all of the force you have.

Dr. Kefler also testified that such "brute force" could be generated by a fall from a forty-story building or being hit on the head with a baseball bat.

Dr. Donahue testified outside the presence of the jury that his "strong feelings and strong opinions are based on the literature and the experience of others who have seen more than I of this type of injury." Yet, he could cite to no such studies or literature. Dr. Donahue also testified that he had no expertise in the area of forensic pathology and no training of any kind in forensic medicine. He stated, "So I certainly don't claim to be a forensic expert, and I'm not even sure what forensics is, but I certainly don't want to be a neuropathologist." Furthermore, Dr. Donahue candidly acknowledged that his conclusions were derived from speculation. He testified that parents want an explanation of what made their children sick, so "a clinician, when a patient comes into his hospital, speculates on a million things but when he is finished-or when she is finished speculating, they come down with an opinion."

Nevertheless, Dr. Donahue was permitted to testify before the jury regarding the "settings in which this injury would occur." Dr. Donahue described three such settings: (1) "falls from a high distance, i.e. several stories"; (2) "children involved in high velocity motor vehicle accidents"; and (3) "children who have been injured non-accidentally or children who have been dashed against a wall or otherwise brutalized." Dr. Donahue testified that such injuries could be caused by a fall of at least ten feet or by the child's head being run over by the tire of a car traveling five

miles an hour. He also stated that these "severe traumatic injuries" could be suffered by a child who is held by his feet and thrown against a wall or dropped forcefully against a hard object. In particular, Dr. Donahue gave the following example: "A child who is in a car and flies out of a car like they are in a car accident and they are in an infant seat and the infant seat flies out of the car and flies up against the wall." When asked whether a human being could generate a sufficient amount of force with one blow to cause the type of injury suffered by the child in this case, the doctor responded, "If the person giving the blow was Hulk Hogan and they were running a[s] fast as they could when they delivered the punch and they had about a ten-yard start, yes."

Under the old rule, once a threshold level of expertise was established, any weaknesses or defects in a witness's qualifications went to the weight of his testimony, not to its admissibility. The jury was credited with the ability to determine whether the "expert's" testimony was worthy of belief. The jury is no longer credited with sufficient judgment to make this determination. Rather, the trial judge is now the gatekeeper, deciding in advance whether a purported expert is worthy of the jury's confidence. I am not aware that a judge's training has been expanded into scientific or other areas of expertise. It is not, however, the function of an intermediate appellate court to rewrite the rules of evidence or to criticize them. Our duty is simply to try to understand the rules and to determine whether a trial court abused its discretion by its rulings on evidentiary matters.

In the case now before us, the majority holds that the trial court properly ignored the doctors' uncontroverted testimony that they were not qualified to testify to causation and mental state. To support its holding, the majority relies on the court of criminal appeals' observation that the *Daubert* inquiry must be flexible to account for those fields of study outside of the so-called "hard" sciences. A flexible test should not, however, dispense with all standards for determining whether a witness is qualified to testify as an expert and the reliability of such testimony, particularly where, as here, the proffered "expert" witnesses deny having any expertise in the subject matter about which they will testify.

My fear is that, in the name of flexibility, we are developing four different standards for the admission of expert testimony. Although we now have a single set of evidentiary rules for both civil and criminal trials, we appear to be applying these rules differently depending on who is offering the evidence in a particular case. The rules of evidence should be applied in the same manner whether the evidence is offered by the State, a criminal defendant, a civil plaintiff, or a civil defendant. When application of the rules is determined by the party offering or opposing the evidence, we risk a fearful departure from the rule of law.

In *Pack v. Crossroads, Inc.*, this court held that the plaintiffs did not demonstrate that Dolores Alford, a nurse, had particular expertise in the field of nursing home standards of care and, therefore, the trial court did not err in finding her unqualified to testify to those standards in a malpractice action against a nursing home.[1] We held that Alford's testimony on this subject was properly excluded despite the fact that Alford held both a nursing diploma and a Ph.D.[2] At trial, Alford explained that she

---

**1.** 53 S.W.3d 492, 505–07 (Tex.App.-Fort Worth 2001, pet. denied).

**2.** *Id.* at 506.

had been a staff nurse and a clinical instructor in a licensed vocational nurse program, the education director of Seaton School of Nursing, an assistant professor of nursing at Texas Women's University in Houston, and was currently a consultant with the Department of Justice to determine why troubled, government-run nursing homes are unable to meet regulations.[3] Alford had also received a fellowship in the American Academy of Nursing, the Honorary Nurse Practice Award from the American Nurses Association, and had been named a distinguished alumnus at Louisiana State University and the University of Texas.[4] Alford testified that her experience included consulting nursing homes on resident problems and teaching aides in nursing homes.[5] In addition, Alford stated that she had written many published works about nursing care in general and in nursing homes specifically and that she had worked with nurses in nursing homes to assess the conditions of residents and develop a care plan to meet their needs.[6]

After acknowledging this training and experience, we pointed out that Alford never fully explained her responsibilities with the Texas Department of Human Services and that she claimed to be under a federal gag order prohibiting her from revealing specifics about her job with the Department of Justice.[7] We also noted that Alford conceded that she had never worked as a staff nurse or a charge nurse in a nursing home, had never been an administrator of a nursing home, had never performed nursing functions or routine shift work in a nursing home on a day-to-day basis, and had not delivered health care to someone other than a relative since 1991.[8] For these reasons, we concluded that the plaintiffs did not meet their burden to establish that Alford possessed specific expertise on the subject of the standards of care for a nursing home.

In *Yard v. Daimlerchrysler Corp.*, we held that a medical pathologist was not qualified as an expert competent to testify whether a driver's skull fracture was caused by the failure of his vehicle's air bag to deploy.[9] We pointed out that the pathologist, Dr. Friedlander, indicated in his deposition testimony that he was not "completely comfortable" with his expertise in this area.[10] Friedlander admitted that he did not know what types of forces were required to cause this particular fracture and that he did not try to calculate what forces would be generated with and without an air bag "because that would be pretentious and that would be getting out of the area that I am—that I'm good at. So I'll leave these to the biomechanics people and ... the engineering people."[11] In holding that the trial court did not err by concluding that Friedlander was not qualified to testify about whether the driver would have survived the accident if his air bag deployed, we reasoned as follows:

> This record shows that Friedlander's opinions on whether a failed air bag caused Bradley's injuries were based more on Friedlander's review of the published literature about basilar skull fractures and the statistical effects of air

---

3. *Id.*

4. *Id.*

5. *Id.* at 506–07.

6. *Id.* at 507.

7. *Id.*

8. *Id.*

9. 44 S.W.3d 238, 241–42 (Tex.App.-Fort Worth 2001, no pet.).

10. *Id.* at 241.

11. *Id.* at 242.

bags on fatality rates than on his expertise as a medical doctor and forensic pathologist. While Friedlander's medical training and experience may have contributed to his ability to understand the published literature, there is no evidence that he had any more specialized knowledge about the effects of deployed or failed air bags in automobile accidents than other well-educated individuals with access to the same literature.[12]

Here, when asked what theories, techniques, or methodologies he utilized to develop his opinion on the degree of force necessary to cause the injury present in this case, Dr. Kefler responded:

These areas have been studied—I'm not here to quote chapter and verse in those studies. I wasn't told to look it up, but I don't intend to do that.

But there have been studies and experiments—it's like a crash test. It takes this amount of G-forces and factors and physics in order to cause an injury of this degree of severity and an injury that we can compare to just falling off of a bed, for example, or bumping the head against a dresser. It just doesn't cause this degree of severe injury.

Dr. Kefler stated that he relied on "[p]eer review journal studies and experiments, [and] clinical retrospective studies."

Similarly, Dr. Donahue testified that his conclusions were drawn from his review of the published literature about the causes of head injuries to children. As in *Yard*, while the doctors' medical training and experience may have contributed to their ability to understand the relevant literature, there is no evidence that they had any more specialized knowledge about the causes of the child's injuries in this case than other individuals with access to the

same literature. As did Dr. Friedlander, Dr. Kefler and Dr. Donahue both candidly admitted their lack of expertise in this area. While the old rule allowing the jury to determine the weight to be given the testimony would have permitted all three doctors and nurse Alford to present their opinions to the jury, the new rule establishes a different threshold of admissibility. That threshold, however, must be measured by the same benchmark whether the testimony is offered by the State or a criminal defendant, a civil plaintiff or a civil defendant. Equal application of the law is the foundation of due process guarantees and, more essentially, of the rule of law.

Because the standard we set forth in the case now before us is in direct conflict with the standard we have established when similarly qualified expert testimony offered by a civil plaintiff has been disallowed, I respectfully dissent to the majority's holding regarding the admissibility of Dr. Kefler's and Dr. Donahue's testimony on the issue of causation.