roland richard green v. the state of texas

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NOS.   2-02-144-CR

2-02-145-CR

ROLAND RICHARD GREEN APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM THE 396TH DISTRICT COURT OF TARRANT COUNTY

------------

OPINION

------------

I.  Introduction

Appellant Roland Richard Green (“Green”) was charged by two indictments of robbery causing bodily injury, aggravated assault with a deadly weapon, theft from person, and violation of a protective order.  The indictments also contained habitual offender notices and alleged prior felony convictions for enhancement purposes.  Following trial, a jury convicted Green on all counts, and the court assessed punishment at twenty years’ imprisonment on the theft from person conviction and thirty years’ imprisonment on each of the other three offenses, and ordered the sentences to run concurrently.  In three points, Green complains that the evidence is legally and/or factually insufficient to support his various convictions and contends that the trial court committed reversible error by denying a mistrial following a prejudicial hearsay response from one of the State’s witnesses.  We will affirm.

II.  Background Facts

Patricia Maloney-Green (“Patricia”) met Green in 1980 and married him in 1985.  She described her marriage to Green as “[v]ery rocky” and abusive at times.  In November of 1999, Patricia moved to Chicago for a brief period after Green threatened to kill her.  During the few months that Patricia resided in Chicago, Green called to speak with their children and sent letters threatening Patricia.  In one of these letters, Green threatened to throw gasoline on Patricia and set her on fire.  Patricia testified that, based upon her past relationship with Green, she believed his threats.

Patricia, who is a licensed vocational nurse (LVN), had difficulty getting her license reinstated in Illinois, so she returned to Fort Worth in January of 2000.  Due to Green’s threats, Patricia applied for and received a protective order against Green in February 2000. 
 The order prohibited Green from:

Committing family violence on or against Patricia Maloney-Green;

Communicating directly with Patricia Maloney-Green in a threatening or harassing manner or communicating a threat through any other person to Patricia Maloney-Green;

Going to or within 200 yards of the residence or place of employment or business or child care facility or school of Patricia Maloney-Green, [C.G.], [C.G.], or [L.G.],
(footnote: 1) those specifically being:

. . . .

Any place of employment or business of Patricia Maloney-Green in Tarrant County, Texas;

. . . .

Removing [C.G.], [C.G.], or [L.G.] from the possession of Patricia Maloney-Green or from the jurisdiction of the Court. 

Patricia testified that “[t]hings were quiet” between herself and Green during the months following issuance of the February 2000 protective order; no arguments ensued and no threats were made between the two.  Patricia and Green divorced in July 2000.  In October or November of that year, however, Patricia invited Green to move back into her house to help take care of her two teenage children.  Patricia testified that Green slept on the couch and understood that she did not want to renew their relationship as a couple. Circumstances were “friendly” for a while after Green moved in, but things eventually began to deteriorate, and Green became “sexually aggressive” toward Patricia.

By mid-January of 2001, Patricia and the children had grown increasingly unhappy with the situation, and Patricia asked Green to pack his things and leave.  After asking Green to leave, Patricia left to take one of the children to school.  Then, fearful that “there would be trouble,” Patricia called the police and requested officers to accompany her back home.  When Patricia and the police arrived, Green was packing his things.  The police placed Green under arrest for violation of the protective order.

Later that January, Patricia’s children saw Green and invited him into the house for something to eat.  Patricia testified that “[a]ll the while, he was making derogatory comments toward me.  While he was eating with a fork, he kept getting closer to me, poking at my face with a fork until my oldest [child] stepped between us.”

Patricia had no further contact with Green until the night of January 23, 2001.  That evening, Patricia was scheduled to work the 10:45 p.m. to 7:15 a.m. shift at Wellington Oaks nursing home.  She testified that she drove her car to the parking area in front of the nursing home, “pulled in and parked the car.  Got [her] bag and stuff together to get out of the car.  Opened the door, got out, turned around and [Green] was standing there.”  She testified that the protective order was still in effect at the time.  Patricia could see what she thought was “a limb off one of the trees” in Green’s hand.  She asked Green what he was doing there, but Green did not answer.  Instead, Green “started running at [Patricia] and swinging the tree limb.”  Patricia recalled the events at trial:

Q.  Now, he started running at you and then what happened?

A.  He started swinging that branch.

Q.  Okay.  And then?

A.  Things happened real fast.  I remember holding my hands up blocking as many blows as I could.  Of course, people were coming to work.  He eventually hit me in the head with one of the swings and I went to the ground and that’s where things get hazy.  I don’t know how many more times he hit me.  I don’t know why he stopped.  I remember him trying to pick me up off the ground one time.

. . . .

A.  Next thing I remember he’s gone.  And I don’t know whether he helped me up off the ground or myself.  I remember running down the sidewalk to get in the building.  And I remember the nurses there helping.

During the assault, Patricia sustained what she described as “a lot of scrapes and little cuts,” “abrasions, bruises,” and “a humongous hematoma” or “bump about the size of [her] fist” on the left side of her forehead.  She was transported to a hospital for treatment and released a few hours later.  Patricia later learned that Green had run off with her purse.

Vera Williams, a certified nurses’ assistant at Wellington Oaks nursing home, testified that her daughter Stacy drove her to work on the night of January 23, 2001.  As they approached the nursing home, Vera saw a man and woman struggling in the parking lot.  Pulling into the driveway, Vera recognized the struggling woman as her coworker, Patricia, and realized that the man “had her on the ground and he was hitting at her” with an object that “looked like an old tree limb.”  From her vantage point, Vera could hear Patricia calling out for help and saw that she had her arms up, trying to ward off the man’s blows. Yelling at the man to leave Patricia alone, Vera “banged on the glass doors of the nursing home and was screaming for someone in there to call the police.” She testified that she “got a good glimpse” of the man striking Patricia, and confirmed that it was Green. 

Vera Williams’s daughter, Stacy, testified that she also witnessed the altercation between Patricia and Green in the Wellington Oaks parking lot.  Stacy saw Patricia on the ground and Green “standing there in front of her, beating her.”  Stacy described the object Green was beating Patricia with as “a stick or something pretty big,” perhaps “a four-by-four or something like a branch.  It was brown and pretty big.”  After Vera got out of the car yelling for Green to stop, Stacy testified that Green ran off.  A young male employee came out of the nursing home and began chasing Green on foot.  After checking on Patricia, Stacy drove her car after the young man, picking him up and dropping him off again in the area Green had been seen running.  Stacy then flashed her lights at a passing police officer and pointed him in the direction of Green and the young man giving chase.

Fort Worth Police Officer L.A. Knight arrived at the nursing home shortly after the assault and spoke with Patricia about the incident.  Officer Knight relayed Green’s description to other officers in the area and checked the area around Patricia’s car for the “stick” Green may have used as a weapon.  Officer Knight found a two-by-four with protruding nails
 lying near Patricia’s car. Puncture-like wounds on Patricia’s hands and arms led Officer Knight to believe that the two-by-four she seized at the scene was the weapon used in the assault.  Officer Knight testified that, in the manner of its use, the two-by-four was capable of causing serious bodily injury or death.

On the night of January 23, 2001, Fort Worth Police Officer A.L. Phillips was dispatched to the scene of a domestic disturbance at the Wellington Oaks nursing home.  Officer Phillips proceeded to the area, keeping a lookout for the man suspected in the assault.  About half a mile from the nursing home, Officer Phillips saw a black male “peeping around the corner of a bar at 312 East Hattie.”  As Officer Phillips drove east along East Hattie, the man “turned and started running to the railroad tracks . . . located behind the bar.”  Officer Phillips and his partner made a U-turn to get behind the bar, but the man was already out of sight.  

Fort Worth Police Officer S.D. Fineman was also in the area at the time of the assault and heard the police broadcast about a male suspect fleeing on foot.  He surmised that the suspect may have fled toward the railroad tracks nearby and began searching the area.  He offered the following testimony regarding the suspect’s capture:

Q.  Could you describe for the jury what the area is like and where you saw this person?

A.  It’s a grassy, weed overgrown area.  Got a couple of railroad tracks going through it.  There’s a dirt road that runs along the east side which is what I was on.  It’s a rather severe ditch, about 15 feet deep, that you have to scramble down and up.  And it’s got some trees and it’s basically your normal railroad area about 100 yards across.  

. . . .

A.  There was a small mound of dirt on the far side of the ditch.  I could see a body laid out as if they were trying to hide on the back corner.  I advised that I had a suspect over the air that I thought was the person we were looking for.

I got out of the car, went up, down the ditch, up the ditch and approached the person.

. . . .

Q.  Okay.  When you got to the person, what kind of condition were they in?

A.  Laid out, unresponsive.  Not actively fighting by any means. Acting more or less like they were exhausted, breathing heavy.

Officer Fineman handcuffed the suspect, and located a purse matching the one stolen from Patricia lying just an inch from the man’s hand.  A driver’s license in the man’s wallet confirmed 
that the suspect was Appellant Roland Richard Green.  Officer Phillips confirmed that Green was the same man he had observed peeking around the corner of the bar on East Hattie. 

III.  Sufficiency of the Evidence

In his first and second points, Green complains that the evidence is legally and factually insufficient to support his convictions.
 

A.  Legal Sufficiency

Green contends in his first point that the evidence is legally insufficient to support his convictions for robbery causing bodily injury, aggravated assault with a deadly weapon, and violation of a protective order. 
 Specifically, Green argues that the evidence is insufficient because the State failed to prove beyond a reasonable doubt that the grand jury used due diligence in attempting to discover the deadly weapon used to inflict Patricia’s injuries, resulting in a fatal variance between the indictment and the evidence.

The State indicted Green for violating a protective order by committing an act of family violence against Patricia in one of three ways: “by hitting Patricia Maloney Green, with a board,” “with a tree branch,” or “with an object unknown to the grand jury.”  Likewise, the indictment charging Green with robbery causing bodily injury and aggravated assault with a deadly weapon alleged that Green committed the acts by “hitting [Patricia] with a board,” “hitting her with a tree branch,” or “hitting her with an object unknown to the grand jury.”  Thus, the State alleged alternate manners and means of committing the charged offenses by including three paragraphs under each of the three counts.

An indictment may contain as many separate paragraphs charging the same offense as is necessary to meet the contingencies of the evidence. 
Graham v. State
, 19 S.W.3d 851, 853 (Tex. Crim. App. 2000).  When alternate manners or means of committing a crime are alleged, it is sufficient to prove only one of the manners or means set forth in the indictment.  
Rosales v. State
,
 4 S.W.3d 228, 231 (Tex. Crim. App. 1999), 
cert. denied
, 531 U.S. 1016 (2000) (citing
 
Kitchens v. State
, 823 S.W.2d 256, 258-59 (Tex. Crim. App. 1991), 
cert. denied
, 504 U.S. 958 (1992) (holding jury’s general guilty verdict on an indictment charging alternative theories of committing the same offense will be upheld if evidence supports any of the theories alleged)). 
 It follows that if one or more of the specific manners or means of committing the crime is supported by sufficient evidence, the State is not required to prove that the jury used due diligence in ascertaining the identity of the alternative instruments used in the crime.  
Accord Fagan v. State
, 89 S.W.3d 245, 247-49 (Tex. App.—Texarkana 2002, pet. ref’d) (holding that, when indictment alleged sexual assault by contacting victim’s buttocks with either male sexual organ or an object unknown to the grand jury and sufficient evidence supported male sexual organ finding, issue of whether grand jury used due diligence in ascertaining the manner and means of the offense was irrelevant).

Green does not argue on appeal that the evidence is legally insufficient to support a finding that he assaulted Patricia with either a board or a tree branch.  Because Green does not challenge the legal sufficiency of the evidence underlying the two alternative theories presented to the jury, we are required to uphold the jury’s verdict.  
See Henderson v. State
, 77 S.W.3d 321, 326-27 (Tex. App.—Forth Worth 2002, no pet.) (holding that, when appellant fails to challenge legal sufficiency of evidence as to alternate manners and means,
 appellate court is required to uphold sufficiency of the evidence if the evidence is sufficient to convict under any of the submitted allegations).

Moreover, our complete and detailed examination of the evidence in this case illustrates that legally sufficient evidence does exist to support a finding that Green beat Patricia with either a board or a tree branch as alleged in the indictments.  Patricia, Vera Williams, and Stacy Williams all testified that Green was swinging and hitting Patricia with an object that looked like a tree branch or limb.  Although Patricia and Vera were unable to confirm that State’s Exhibit One, the two-by-four with protruding nails discovered at the scene, was in fact the weapon used in the attack, Stacy did testify that the object looked like a two-by-four, and agreed that State’s Exhibit One could have been the weapon used.  In addition, Officer Knight testified that Patricia’s injuries were consistent with the type of wounds that would be sustained if a person were struck repeatedly with the board found at the scene.  Therefore, viewing the evidence in the light most favorable to the jury’s verdict, we hold that the evidence is legally sufficient to support Green’s convictions for violation of a protective order, robbery causing bodily injury, and aggravated assault with a deadly weapon.  
See Jackson v. Virginia
, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); 
Burden v. State
, 55 S.W.3d 608, 612 (Tex. Crim. App. 2001).  Green’s first point is overruled.

B.  Factual Sufficiency

In his second point, Green challenges the factual sufficiency of the evidence supporting his convictions for robbery causing bodily injury, aggravated assault with a deadly weapon,
 and theft from person. 
 In support of this contention, Green emphasizes testimony he offered 
during punishment
 that Patricia was the aggressor in this incident and that he was merely helping her up off the ground after she twice ran into the car door and knocked herself down during the argument.  Pointing out that Green only returned to live with Patricia at her invitation and that he subsequently purchased a mattress for the dwelling, Green then argues that his “version of events certainly implies that some sort of romantic relationship may have existed” between the two, and that “[i]f true, then his assertion that the two were having an argument and that Patricia . . . sought to manufacture an assault charge against him becomes more credible.”  Therefore, he concludes, the evidence is factually insufficient to support his convictions.

In reviewing the factual sufficiency of the evidence to support a conviction, we are to view all the evidence in a neutral light, favoring neither party. 
 Johnson v. State
, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000); 
Clewis v. State
, 922 S.W.2d 126, 129, 134 (Tex. Crim. App. 1996).  Evidence is factually insufficient if it is so weak as to be clearly wrong and manifestly unjust or the adverse finding is against the great weight and preponderance of the available evidence.  
Johnson
, 23 S.W.3d at 11.  Therefore, we must determine whether a neutral review of all the evidence, both for and against the finding, demonstrates that the proof of guilt is so obviously weak as to undermine confidence in the 
verdict
, or the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof.  
Id.
  In performing this review, we are to give due deference to the fact finder’s determinations. 
 Id.
 at 8-9; 
Clewis, 
922 S.W.2d at 136.  We may not substitute our judgment for that of the fact finder’s.  
Johnson
, 23 S.W.3d at 12.  Consequently, we may find the evidence factually insufficient only where necessary to prevent manifest injustice.  
Johnson
, 23 S.W.3d at 9, 12; 
Cain v. State
, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).

To make a determination of factual insufficiency, a complete and detailed examination of all the relevant evidence is required.  
Johnson
, 23 S.W.3d at 12.  A proper factual sufficiency review must include a discussion of the most important and relevant evidence that supports the appellant’s complaint on appeal.  
Sims v. State
, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

Evidence that supports Green’s assertion that the evidence is factually insufficient includes:  Patricia admitted at trial that she harbored a lot of negative feelings toward Green; Patricia agreed that she invited Green to move back in with her and the children in spite of the protective order; Green purchased a new mattress for Patricia’s bedroom after moving back in with her; 
and Patricia could not conclusively identify the object used against her in spite of lights in the parking lot.

Having examined the evidence in a neutral light, including the evidence relevant and supportive of Green’s argument on appeal, we conclude that the proof of Green’s guilt is not so weak as to undermine confidence in the jury’s verdict.  Nor is the evidence of Green’s guilt outweighed by contrary proof. Green’s theory that Patricia fabricated an assault charge against him does not overcome the direct evidence of Patricia’s injuries; the testimony of Vera and Stacy Williams, who saw Green beating Patricia; or the testimony of officers who investigated the assault, found a possible weapon, and apprehended Green and recovered Patricia’s purse near his body.  We hold that Green’s convictions for robbery causing bodily injury, aggravated assault with a deadly weapon and theft from person are supported by factually sufficient evidence.  We overrule Green’s second point.

IV.  Admission of Hearsay Statement

In his third point, Green complains that the trial court erred by denying his motion for mistrial following “an unsolicited, inadmissible, and highly prejudicial hearsay response” given by State’s witness Patricia Green.  Specifically, Green complains of the following exchange during the State’s direct examination of Patricia:

Q.  So the police actually accompanied you back to the trailer?

A.  Yes, ma’am.

Q.  And was [Green] still there?

A.  Yes, ma’am.

Q.  Was he packing his things or what was he doing?

A.  Yeah, he was packing his things.

Q.  And what was your purpose in calling the police?

A.  I was afraid.

Q.  And what was your reasoning for being afraid?

A.  [Green]’s a very strong man.  And once you’re on the receiving end of that, you try to be a little bit more careful.

Q.  So the police accompanied you back to your house.  And was [Green] arrested at that time?

A.  I believe he was, yes.

Q.  Was that your purpose, to have him arrested?

A.  No, it wasn’t.  It wasn’t.  
And if he hadn’t been so abusive with the police - - 

[
Defense counsel
]:  Objection, Your Honor, that’s nonresponsive.

The Court
:  Sustained.

[
Defense counsel
]
:  I would move the Court to instruct the jury to disregard the witness’ answer.

The Court
:  The jury will disregard the last answer of the witness.

[
Defense counsel
]
:  Respectfully move for a mistrial, Your Honor.

The Court
:  Overruled.  [Emphasis added.]

Green argues that “[s]ince [his] version of events
(footnote: 2) was obviously different from [Patricia’s], her interjection of such a harmful hearsay statement was greatly prejudicial to [his] case and constituted reversible error, in spite of the trial court’s instruction to disregard.”  The State asserts that Green has not preserved this point for our review, and alternatively that the trial court’s instruction to disregard cured any prejudice.

To preserve a complaint for appellate review, Rule 33.1(a) requires the complaining party to make a timely and specific request, objection or motion stating the grounds for the ruling sought from the trial court.  
Tex. R. App. P. 33.1(
a).  However, an objection on the grounds of “nonresponsiveness” “merely informs the trial court why the objection was not made prior to the answer being given.”  
Smith v. State
, 763 S.W.2d 836, 841 (Tex. App.—Dallas 1988, pet. ref’d).  Thus, a complaint that a witness’s response is nonresponsive should not result in the exclusion of evidence unless “the objection timely and specifically directs the trial court’s attention to why, beyond its nonresponsiveness, the evidence is inadmissible.”  
Id.
  To exclude the testimony and obtain an instruction to disregard, the complaining party must then address both the nonresponsiveness and the inadmissibility of the statement.  
Id.
  “Further, a blanket ‘nonresponsive’ objection alone is an insufficient objection to preserve error where the response is a hybrid answer - - that is, where a portion of the answer is objectionable and a portion of the answer is not objectionable.”  
Id.

In this instance, Patricia’s answer was such a hybrid response.  The first portion of her answer directly responded to the prosecutor’s question about whether her intent in calling the police was to have Green arrested.  Thus, that part of the statement was clearly responsive and not objectionable.  The latter portion however, indicating that Green may have been “abusive” toward the officers immediately prior to his arrest, was unsolicited and objectionable. Although Green asserts on appeal that Patricia’s statement was inadmissible hearsay and was highly prejudicial to his case, he made no such objection to the trial court, but stated only that Patricia’s answer was nonresponsive. Accordingly, Green failed to present a timely and specific objection to the trial court and has not properly preserved this complaint for our review.

Nonetheless, we note that the trial court not only sustained Green’s objection to the nonresponsiveness of Patricia’s answer, but also instructed the jury to disregard the statement.  As a general rule, a trial court’s instruction to disregard is sufficient to cure any nonresponsive answer.  
Hughes v. State
, 878 S.W.2d 142, 154 (Tex. Crim. App. 1993) (op. on reh’g), 
cert. denied
, 511 U.S. 1152 (1994). However, if “the evidence is so clearly calculated to inflame the minds of the jury and is of such a character as to suggest the impossibility of withdrawing the impression produced on their minds,” such an instruction may not suffice. 
Faison v. State
, 59 S.W.3d 230, 244 (Tex. App.—Tyler 2001, pet. ref’d) (citing 
Ridyolph v. State
, 545 S.W.2d 784, 787 (Tex. Crim. App. 1977)).  After reviewing the record, we conclude that Patricia’s answer was not so inflammatory as to render the trial court’s instruction ineffective.  Relying on the presumption that the jury will follow the trial court’s instruction to disregard, except in extreme cases, we hold that the trial court did not err by denying Green’s motion for mistrial.  
See Hughes
, 878 S.W.2d at 154
;
 Gumpert v. State
,
 48 S.W.3d 450, 458 (Tex. App.—Texarkana 2001, pet. ref’d)
, cert. denied
, 535 U.S. 1064 (2002).
  Green’s third point is overruled.

V.  Conclusion

Having overruled each of Green’s points, we affirm the trial court’s judgments.

PER CURIAM

PANEL F: WALKER, J.; CAYCE, C.J.; and DAY, J.

DO NOT PUBLISH

Tex. R. App. P. 
47.2(b)

DELIVERED: July 24, 2003

OPINION INFORMATION TO PUBLISHERS

FROM

COURT OF APPEALS

SECOND DISTRICT OF TEXAS 

FORT WORTH

CASE DOCKET NUMBER:

2-02-144-CR

2-02-145-CR

NAME OF CASE:

ROLAND RICHARD GREEN

V.

THE STATE OF TEXAS

DATE OPINION OR ORDER FILED:

JULY 24, 2003

DATE REHEARING DENIED:

              

              

TRIAL COURT:

396
TH
 DISTRICT COURT

TRIAL COURT JUDGE:

HON. GEORGE WILLIAM GALLAGHER 

COUNTY:

TARRANT

              

              

ATTORNEY FOR APPELLANT:

Mary B. Thornton

Fort Worth, Texas

ATTORNEY FOR APPELLEE:

Tim Curry, Crim. D.A., Charles M. Mallin, Asst. Crim. D.A. and Chief of the Appellate Division, and Donald J. Piller, and Dawn Rhoden, and Timothy Bednarz, Asst. Crim. D.As.

Fort Worth, Texas

FOOTNOTES
1:
[C.G.] and [C.G.] are Green and Patricia’s two children; [L.G.] is Green and Patricia’s grandchild.

2:
Green did not testify during the guilt-innocence phase of his trial.