DELONG V. STATE

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NOS.  2-04-410-CR

        2-04-411-CR

JOHN STEWART DELONG APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 4 OF TARRANT COUNTY

------------

OPINION

------------

Appellant John Stewart DeLong appeals from his convictions for three counts of indecency with a child and one count of aggravated sexual assault of a child.  Because we hold that the trial court abused its discretion by excluding the testimony of Appellant’s expert witness on “false memories,” we reverse and remand both cases for new trials.

Background

Appellant does not challenge the sufficiency of the evidence; therefore, we will limit our overview of the evidence to that necessary to put Appellant’s complaints into context.  Appellant was charged by three separate indictments with aggravated sexual assault of a child and indecency with a child, and the three cases were tried together.  The three complainants were H.W., S.K., and J.W.
(footnote: 1)
 H.W. testified that Appellant was her next-door neighbor and penetrated her vagina with his fingers while she was swimming in his pool when she was six or seven years old.  She testified the Appellant repeatedly assaulted her in the same manner over the course of two summers.  H.W. disclosed the abuse to a friend at her eighth birthday party in 1994, and the friend told H.W.’s parents.  H.W.’s parents confronted Appellant about H.W.’s allegations, and she stopped going over to Appellant’s house.  H.W. next reported the alleged abuse to personnel at Cook Children’s Medical Center in 2001 when she was fourteen years old. 

J.W. testified that her mother had an off-and-on dating relationship with Appellant.  J.W. occasionally spent the night at Appellant’s house when she was between five and ten years old.  She said that Appellant would rub her back when he put her to bed and usually rubbed her buttocks, too.  J.W. testified that on one occasion when Appellant was helping J.W. put on her swimsuit, he touched her sex organ. 

S.K. is the daughter of a former employee of Appellant’s.  She testified that she was a frequent visitor in Appellant’s home.  S.K. said that Appellant assaulted her on three occasions in 1993 when she was 13:  once while she was swimming in his pool, once in his living room while she and Appellant watched a movie, and once in a bedroom while she was spending the night at Appellant’s home. 

Of particular significance to this appeal are the circumstances under which the complainants made their outcry statements.  H.W. was the first complainant to make an outcry statement.  In February 2001, while she was being examined at Cook Children’s Medical Center in connection with an unrelated incident, H.W. stated that Appellant assaulted her years earlier. Hospital personnel reported H.W.’s outcry to the police as required by law, and Detective Patrick Ripley of the Bedford Police Department began an investigation. 

On May 17, 2001, J.W. and her mother, Jennifer Todd, were visiting at Appellant’s house.  Appellant’s wife at the time of trial, Rebecca,
(footnote: 2) testified that she returned home from an errand to find Todd and H.W.’s mother having an animated discussion in front of Appellant’s and H.W.’s adjacent homes.  She said she approached the women and asked them what was going on, but they refused to speak to her.  Angered, Rebecca entered her and Appellant’s home and told Appellant that she did not want J.W. and her mother to visit Appellant’s home anymore; J.W. was present and heard Rebecca’s outburst.  Todd entered the home, and Appellant “made it clear that she needed to leave.” Todd went back outside and resumed her conversation with H.W.’s mother for another fifteen minutes, then left with J.W. 

As Todd and J.W. drove away from Appellant’s house immediately following this incident, Todd told J.W. that Appellant had been “inappropriate” with H.W. and asked J.W. if Appellant had ever been inappropriate with her.  J.W. said that Appellant had rubbed her back and that he had “rubbed too low.”  Todd then told J.W. that Appellant had touched several girls inappropriately and asked J.W. whether Appellant had ever showed her his penis, to which J.W. answered, “No, mom.”  Next, Todd told J.W. that Appellant had put his fingers in H.W.’s vagina; J.W. said that Appellant had not done that to her. 

That night or the next day, Todd called Detective Ripley, whose name she obtained from H.W.’s mother.  Detective Ripley told Todd to take J.W. to the Alliance for Children, where she was interviewed by a counselor outside of Todd’s presence.  When Todd and J.W. returned home, J.W. told Todd that Appellant had touched her pubic area. 

H.W.’s mother also gave S.K.’s name to Detective Ripley.  Detective Ripley interviewed S.K. at her place of employment on May 30, 2001.  
 Detective Ripley told her that Appellant had “been doing inappropriate things to girls,” and asked if Appellant had ever touched her inappropriately.  Detective Ripley told S.K. that H.W. was one of the girls in question.  S.K. denied that Appellant had molested her.  After her work shift ended, S.K. drove to H.W.’s house and talked to H.W.’s mother.  H.W.’s mother convinced S.K. to call Detective Ripley and “tell him the truth.” 
 H.W.’s mother telephoned Detective Ripley, and S.K. told him that Appellant had done “inappropriate things.” 

On June 30, 2001, Detective Ripley interviewed S.K. again.  
This time, S.K. told Detective Ripley that Appellant had assaulted her in his living room and in his swimming pool.  She also told him that Appellant had entered her bedroom on one occasion when S.K. was sleeping over at Appellant’s house, but she did not indicate that Appellant had molested her then.  Detective Ripley asked S.K. to give him a written statement.  
He allowed her to prepare the written statement at home, rather than at the police station, and she worked on her five-page handwritten statement for several days. 
 In the written statement, S.K. alleged, for the first time, that Appellant assaulted her when she slept over at his house. 

Appellant offered Dr. Elizabeth Loftus as an expert on the phenomenon of “false memories” to show that the complainants’ allegations and the circumstances surrounding their outcry statements were consistent with the false-memory phenomenon.  Outside the presence of the jury, Dr. Loftus testified that she is a psychologist who specializes in the area of cognitive psychology and, more specifically, the area of human memory and suggestibility.  She has studied human memory since the 1960s and has published articles, papers, and textbooks on the subject since the early 1970s. Dr. Loftus said that she has conducted hundreds of experiments on human memory involving over 20,000 subjects; many of the experiments involved suggestibility.  Her curriculum vitae includes a list of her peer-reviewed and other publications, most on the subject of memory and many on suggestibility.
(footnote: 3) Appellant offered three of those publications, all on the subject of false memories, to the trial court.  After a hearing under rule of evidence 702, the trial court excluded Dr. Loftus’s testimony.  We will discuss Dr. Loftus’s proposed testimony in greater detail later in this opinion.

The jury found Appellant not guilty on three counts alleging various sexual offenses against H.W.  It found him guilty of two counts of indecency with a child by fondling with regard to S.K. and one count each of aggravated sexual assault of a child and indecency with a child with regard to J.W.

Discussion

In his first point, Appellant argues that the trial court erred by excluding the testimony of Dr. Elizabeth Loftus.  The gist of the testimony that Appellant sought to elicit from Dr. Loftus is that false memories can be induced in the mind of a witness under circumstances similar to those surrounding the outcry statements of the complainants in this case.  The State objected to her testimony as irrelevant.  Ultimately, the trial court excluded her testimony. 

Rule 702 of the Texas Rules of Evidence provides that “if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.”  
Tex. R. Evid
. 702.  Under Rule 702, the proponent of scientific evidence must show, by clear and convincing proof, that the evidence he is proffering is sufficiently relevant and reliable to assist the jury in accurately understanding other evidence or in determining a fact issue.  
Weatherred v. State
, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000) (citing 
Nenno v. State
, 970 S.W.2d 549, 560-61 (Tex. Crim. App. 1998)).  

Thus, Appellant’s first point comprises two questions: Is evidence like Dr. Loftus’s false-memory testimony generally relevant, and is Dr. Loftus’s testimony reliable?  We will consider each question in turn.
(footnote: 4)
A.  Relevance

Expert testimony, like all evidence, is not admissible unless it is relevant.  
See
 
Tex. R. Evid.
 402, 702.  An expert may not testify that a particular witness is being truthful or lying.  
See Yount v. State
, 872 S.W.2d 706, 711 (Tex. Crim. App. 1993).  Rather, expert testimony is limited to situations in which the expert’s knowledge and experience on a relevant issue are beyond that of an average juror.  
Id. 
at 710-11. 
 There is a “fine but essential” line between helpful expert testimony and impermissible comments on credibility.  
Schutz v. State
, 957 S.W.2d 52, 60 (Tex. Crim. App. 1997) (quoting 
State v. Myers
, 382 N.W.2d 91, 98 (Iowa 1986)).
(footnote: 5)  Expert opinion must aid—not supplant—the jury’s decision.  
Id. 
at 59.

Expert opinion does not assist the jury if it constitutes “a direct opinion on the truthfulness” of a complainant’s allegations.  
Id
. (quoting 
Yount
, 872 S.W.2d at 708). 
 “Truthfulness” encompasses nonmoral as well as moral considerations.  
Id.
 at 59, 68.  For example, a child complainant who has been exposed to manipulative pressure from others may knowingly make false allegations (a moral consideration) or may 
have been manipulated into believing that certain false allegations are actually true (a nonmoral consideration).  
Id.
 at 60.  In order for a person’s recitation of events to be true, the events described must be both honestly related and accurately perceived and remembered.  
Id.
 at 68-69.  While neither honesty nor accuracy guarantees truthfulness by itself, each is nevertheless a direct comment on truthfulness, and both constitute particularized testimony concerning the alleged victim’s credibility. 
 
Id.
 at 69.

“Even so, psychologists and others in the mental health profession have much expertise in the area of human behavior that can be of assistance to a fact-finder.” 
Id
. For example, the court of criminal appeals has recognized expert knowledge concerning the behavioral characteristics typically exhibited by sexual abuse victims.  
Id
. (citing 
Cohn v. State
, 849 S.W.2d 817 (Tex. Crim. App. 1993)).  And in 
Shutz
, the court of criminal appeals noted that whether a child exhibits signs of manipulation is similar to whether a child exhibits signs of sexual abuse, because both involve behavioral manifestations of external influence or events acting upon the child.  
Id.
  The court recognized that, as with signs of sexual abuse, experts may also have specialized knowledge regarding signs of coaching, coercion, and suggestion, which they may impart to the jury.  
Id.
  But credibility issues such as whether allegations have been fantasized or whether a child has in fact been manipulated will often involve both psychiatric and psychological information about mental illness and human behavior as well as unspecialized knowledge within the purview of lay jurors.  
Id.
  Once an expert imparts her scientific, technical, or specialized knowledge to the jury concerning either area within her expertise, “jurors are just as capable as the expert in drawing conclusions concerning the credibility of the parties in issue.”  
Id
. (quoting 
Yount
, 872 S.W.2d at 710).  Thus, 
Schutz
 concluded, evidence of manipulation or fantasy, whether relating to mental capacity or moral disposition, should be analyzed under the same rules that govern evidence of truthful or untruthful character.  
Id.
 at 69.

Rule of evidence 608(a) permits a party to attack a witness’s general capacity or disposition to tell the truth.  
Id
.; 
Tex. R. Evid. 
 608(a).  General capacity evidence includes whether a person can
 distinguish between reality and fantasy, and an expert may provide such testimony.  
Schutz, 
957 S.W.2d  at 67-70.  But evidence that a complainant’s specific allegation is the result of fantasy or manipulation is inadmissible unless the party against whom the evidence is offered “opens the door.”  
Id
. at 71.  Such evidence never assists the jury because the jury is just as capable as the expert of drawing the conclusions involved.  
Id. 
at 70-71.

In 
Schutz, 
after an exhaustive review of relevant law from other jurisdictions, the court of criminal appeals identified five categories of general and specific evidence that touch on a complainant’s credibility in child sexual-abuse cases and set out the circumstances under which each category of evidence is admissible:  (1) substantive evidence of guilt that incidentally impacts on credibility (admissible during offering party’s case-in-chief); (2) general testimony relating to impaired witnesses or declarants (admissible during offering party’s case-in-chief if impaired person is expected to be a witness or declarant); (3) general testimony that directly attacks credibility (admissible during offering party’s case-in-chief to attack credibility of witness or out-of-court declarant); (4) general testimony that supports credibility (admissible as rebuttal to attacks on credibility so long as there is a loose fit between the rebuttal evidence and the predicate attacks on credibility); and (5) specific testimony supporting or attacking credibility (may be admitted only to rebut other specific testimony attacking or supporting credibility and only if there is a tight fit between the rebuttal testimony and the previous specific testimony attacking or supporting credibility).  
Id.
 at 75-76.

The testimony of two experts was at issue in 
Schutz
.  The first was a psychologist who testified about the characteristics of children who have been manipulated and who equated fantasizing with lying.  
Id.
 at 58.  The second was a psychologist who testified that the complainant had in fact not been manipulated and that her allegations were not the result of fantasy.  
Id.
  The court held that the first expert’s testimony on the characteristics of children who have been manipulated was admissible because it did not constitute a direct comment on the truth of the complainant’s allegations.  
Id.
 at 73.  But the first expert’s testimony equating fantasizing with lying and the second expert’s testimony that the complainant had not been manipulated and was not fantasizing  were inadmissible because they constituted direct comments on the truthfulness of the complainant’s allegations.  
Id.

In this case, Dr. Loftus testified that a false memory is an untrue memory that the witness or complainant nonetheless believes to be true.  She explained that a false memory can be very detailed, and a person who has a false memory can be very confident and even emotional about the false memory.  Dr. Loftus testified that she could not say whether a particular person is lying or that a particular memory is a false memory—in other words, that she could not comment directly on the truthfulness of a complainant’s allegations—but she could say whether the circumstances indicated suggestion of the sort that can lead to a false memory.  

Appellant’s counsel posed a series of hypothetical situations to Dr. Loftus that tracked the circumstances surrounding the complainants’ outcry statements.  In her opinion, it was “certainly possible” that the circumstances surrounding H.W.’s outcry were consistent with the formation of false memories of the sexual abuse she reported, that J.W.’s outcry was “absolutely” consistent with suggestion and memory contamination, and that there was a “major worry” about suggestibility with respect to S.K.’s outcry—especially because she denied any abuse in her first interview with police, but then alleged abuse after she spoke with other witnesses.  Dr. Loftus said that the circumstances surrounding J.W.’s outcry paralleled the methodology she used in the laboratory to induce false memories in test subjects. 

Of the five categories of credibility evidence identified in 
Schutz
, Dr. Loftus’s false-memory testimony best fits into the third category, general testimony that directly attacks credibility.  An example of general testimony that directly attacks credibility listed by court of criminal appeals includes testimony about the common symptoms or traits of a child who is fantasizing or being manipulated coupled with testimony that the child in question exhibits some or all of those symptoms or traits.  
Id.
 at 75.  Such testimony is “general” in the sense that it does not comment on the truthfulness of the specific allegations made by the complainant.  Dr. Loftus’s testimony was likewise general.  She testified that she could not say that any particular allegation was false, but could say that the circumstances surrounding the complainants’ outcries were consistent with the creation of false memories.  Thus, Dr. Loftus’s false-memory testimony was general testimony that directly attacked the complainants’ credibility, and such evidence is admissible during the offering party’s case-in-chief.  
See id.
; 
see also Wright v. State
, Nos. 01-05-00597-CR, 01-05-00598-CR, 01-05-00599-CR, 2006 WL 2076148, at *8 (Tex. App.—Houston [1st Dist.] July 27, 2006, no pet. h.) (holding defense counsel ineffective for failing to secure expert testimony “regarding false allegations of sexual assault occurring after a divorce and the accepted protocols for interviewing suspected child sexual assault victims,” which would have been admissible under 
Schutz
); 
Segura v. State
, No. 03-03-00685-CR, 2005 WL 2313559, at *4 (Tex. App.—Austin Sept. 23, 2005, no pet.) (not designated for publication) (noting that expert testimony on false memory and “memory hardening” admitted without objection); 
Ard v. State
, No. 05-02-01915-CR, 2004 WL 1813753, at *2 (Tex. App.—Dallas Aug. 16, 2004, pet. ref’d) (not designated for publication) (noting admission without objection of psychologist’s testimony on how memory can be influenced or altered).

At trial, the State argued that Dr. Loftus’s testimony was irrelevant to any question before the jury because Dr. Loftus testified that she could not say whether a witness was lying or whether any particular memory was a false memory.  That argument turns the relevancy analysis on its head because, as we have already observed, an expert may not testify that a particular witness is being truthful.  
See Yount
, 872 S.W.2d at 711.

We hold that Dr. Loftus’s false-memory testimony was general evidence that directly attacked the complainants’ credibility and was, therefore, relevant and admissible during Appellant’s case-in-chief—provided that her opinion was shown to be reliable.

B.  Reliability

The reliability of “soft” science evidence, such as Dr. Loftus’s false-memory testimony, may be established by showing that (1) the field of expertise involved is a legitimate one, (2) the subject matter of the expert’s testimony is within the scope of that field, and (3) the expert’s testimony properly relies on or utilizes the principles involved in that field.
(footnote: 6)  
Weatherred
, 15 S.W.3d at 542.  Rule 702 “imposes a special gatekeeping obligation on the trial court to make sure the expert testimony is reliable.”  
Henderson v. State
, 77 S.W.3d 321, 324 (Tex. App.—Fort Worth 2002, no pet.).  We review a trial court’s ruling on the admissibility of evidence, including expert testimony, under the abuse-of-discretion standard.  
Weatherred
, 15 S.W.3d at 542.

The trial court conducted a gatekeeper hearing outside the presence of the jury.  Dr. Loftus explained how she applies the scientific method to her work by developing a hypothesis, designing an experiment to test the hypothesis, conducting the experiment, testing the validity of the resulting data, and submitting the results for publication in a peer-reviewed journal.  She testified that the experimental techniques and methodologies she employs are generally accepted within the field of psychology and are so fundamental that they are taught to virtually every student of introductory psychology.  Dr. Loftus said that there are hundreds of other psychologists conducting similar scientific research in the field of human memory.  As a member of the peer-review editorial boards of “six or eight” scientific journals, she reviews and evaluates manuscripts submitted by other scientists in the field.  Dr. Loftus described the results of experiments that she and other scientists have conducted on the creation of false memories, and false memories of traumatic childhood events in particular, in test subjects. 

Applying the three-part reliability test articulated in 
Nenno
 and 
Weatherred
, we conclude that Appellant established the reliability of Dr. Loftus’s “soft” science evidence.  Dr. Loftus’s testimony showed that her field of expertise is a legitimate one as reflected by the sheer number of peer-reviewed articles she has published on the subject of memory in general and false memories in particular.  The subject matter of her proposed testimony—whether the circumstances surrounding the complainants’ outcry statements raised the specter of false memories—falls squarely within the scope of that field.  Finally, Dr. Loftus’s opinions were based on the similarities between the facts of this case as reflected in counsel’s hypothetical questions  and the published data from controlled, peer-reviewed experiments conducted in accordance with established scientific methodologies; thus, Dr. Loftus showed that her testimony properly relied on or utilized the principles involved in her field of expertise.

The State cites several scholarly publications on the subject of “repressed” and “recovered” memories and argues that a lack of consensus in the field renders Dr. Loftus’s opinions unreliable.  We reject this argument for two reasons.  First, Appellant presented Dr. Loftus as an expert on false memories, not repressed or recovered memories; thus, the publications cited by the State are not relevant to our analysis.  Second, and more importantly, none of the articles cited by the State were provided to the trial court and are not a part of the appellate record; thus, those publications could not have informed the trial court’s discretion and likewise play no role in our analysis of the trial court’s exercise of that discretion.

Dr. Loftus’s testimony stands in stark contrast to the testimony of other putative experts in cases in which appellate courts have determined that a trial court did not abuse its discretion by excluding an expert’s testimony.  In 
Weatherred
, the putative expert testified that he and others had carried out extensive research on the subject of his expertise and that he had written much on the subject, but he failed to produce or even name any of the studies, research, or writings in question.  
Weatherred
, 15 S.W.3d at 542-43.  In 
Mims v. State
, the Tyler court of appeals held that the trial court did not abuse its discretion by excluding the testimony of a psychologist when less than one-tenth of the psychologist’s practice involved the subject of her testimony; she had written just one article on the subject, and the article had not been published or peer-reviewed; and she had done no research on the subject.  No. 12-02-00178-CR, 2004 WL 949453, at *6 (Tex. App.—Tyler April 30, 2004, pet. denied) (mem. op.) (not designated for publication).

Having concluded that Dr. Loftus’s false-memory testimony was both relevant and reliable, we hold that the trial court’s decision to exclude Dr. Loftus’s testimony was so clearly wrong as to lie outside that zone within which reasonable persons might disagree and constituted an abuse of discretion.  
See
 
Cantu v. State
, 842 S.W.2d 667,  682 (Tex. Crim. App. 1992), 
cert. denied
, 509 U.S. 926 (1993).

C.  Harm Analysis

Having found error, we must conduct a harm analysis to determine whether the error calls for reversal of the judgment.
(footnote: 7)  
Tex. R. App. P.
 44.2.  Generally, the erroneous exclusion of evidence is nonconstitutional error governed by rule 44.2(b) if the trial court’s ruling merely offends the rules of evidence.  
See Solomon v. State
, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001).  Appellant concedes that the error was nonconstitutional; thus, we will apply rule 44.2(b) 
and disregard the error if it did not affect Appellant’s substantial rights.  
Tex. R. App. P.
 44.2(b); 
see Mosley v. State,
 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh’g), 
cert. denied
, 526 U.S. 1070 (1999); 
Coggeshall v. State
, 961 S.W.2d 639, 642-43 (Tex. App.—Fort Worth 1998, pet. ref’d).

A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury’s verdict.  
King v. State
, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing 
Kotteakos v. United States
, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)); 
Coggeshall,
 961 S.W.2d at 643.  When the claimed error is the exclusion of a relevant piece of evidence, as is the case here, conducting a meaningful harm analysis would necessarily require consideration of all evidence which was admitted at trial.  
See Morales v. State
, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000).

We have considered all of the evidence that was admitted at trial.  In addition to the evidence summarized above, the following evidence is potentially relevant to our harm analysis.  In its case in chief, the State offered the testimony of L.W.
(footnote: 8)  L.W. testified that her parents were friends of Appellant’s and that her father was in business with Appellant for a time.  She testified that on one occasion when Appellant and his wife at the time, Ginger DeLong, spent the night in L.W.’s parents’ guest house and L.W. slept in the same bed with Appellant and Ginger, Appellant inserted his finger into L.W.’s vagina.  Ginger DeLong testified that although she occasionally spent the night at L.W.’s parents’ house when Appellant was away on business, she and Appellant never spent the night there together, and she and Appellant never slept in the same bed with L.W. anywhere.  L.W.’s father was involved early on in Detective Ripley’s investigation of Appellant. 

In its rebuttal case, the State offered the testimony of J.S.  J.S. testified that in 1980, when J.S. was seven years old and her mother was dating Appellant, Appellant inserted his fingers into J.S.’s vagina while carrying her “piggy back.”  J.S. testified that this happened on three to five occasions.  J.S. testified that she did not know L.W., the complainants, or their families.  Appellant denied having molested J.S.  J.S’s. testimony, isolated as it is from the circumstances surrounding the complainants’ outcry statements, arguably weighs against Appellant’s theory that the complainants’ outcry statements resulted from false memories.  On the other hand, the jury could believe her testimony and still conclude that the complainants’ outcry statements described false memories.

The case was hotly contested.  In all, twenty witnesses testified over an eight-day period in the guilt-innocence phase.  Eight of those testified for the State, ten testified for Appellant, and Appellant called two as hostile witnesses.  Appellant cross-examined all of the State’s witnesses extensively in an effort to show the unreliability of their testimony.  Because there was no physical or other corroborative evidence, the outcome of the trial hinged entirely on whom the jury believed—the complainants or Appellant.  The defense’s theory at trial was that the complainants’ allegations were false.  Without Dr. Loftus’s testimony, Appellant could not attempt to prove that the complainants made unintentionally false allegations; he could only attempt to show that they were intentionally lying, an altogether more difficult prospect and one in which Appellant ultimately failed.  As we noted above, the First District Court of Appeals
 recently held that counsel was ineffective for failing to offer precisely this kind of expert testimony touching on the credibility of a complainant. 
 
Wright
, 2006 WL 2076148, at *8.  
If believed by the jury, Dr. Loftus’s testimony could have had a substantial effect or influence on the jury’s verdict because it cut to the very heart of a case in which the only evidence of guilt was the testimony of the complainants.  Thus, the exclusion of her testimony had a substantial and injurious effect or influence on the jury’s verdict and affected a substantial right of Appellant’s.  We therefore conclude that the trial court’s error was harmful, and we sustain Appellant’s first point.

Conclusion

Having sustained Appellant’s first point, we remand these cases to the trial court for a new trial.  We do not reach Appellant’s remaining points.   
See
 
Tex. R. App. P.
 47.1.

ANNE GARDNER

JUSTICE

PANEL A: CAYCE, C.J.; LIVINGSTON and GARDNER, JJ.

CAYCE, C.J., dissents without opinion.

DO NOT PUBLISH

Tex. R. App. P.
 47.2(b)

DELIVERED:  November 16, 2006

FOOTNOTES
1:
H.W. and J.W. are not related.

2:
Appellant married Rebecca after he stopped dating Todd.

3:
We note that the supreme court cited extensively several of Dr. Loftus’s publications on the subject of memory in 
S.V. v. R.V.
, 933 S.W.2d 1, 16-19 (Tex. 1996).

4:
We note that the State’s brief does not address the question of relevance but focuses solely on the question of reliability.

5:
Schutz
 is the leading case in Texas on the admissibility of expert testimony concerning credibility in sexual-assault cases, but surprisingly neither party discusses or even cites 
Schutz.

6:
The “hard” sciences, areas in which precise measurement, calculation, and prediction are generally possible, include mathematics, physical science, earth science, and life science; the “soft” sciences, in contrast, are generally thought to include such fields as psychology, economics, political science, anthropology, and sociology.  
Weatherred
, 15 S.W.3d at 542
 n.5.

7:
The State’s brief does not address harm with regard to Dr. Loftus’s excluded testimony.

8:
L.W. is not related to H.W. or J.W.